[Civ. No. 21801. Fourth Dist., Div. Two. Sept. 25, 1980.]

HERMALINDA CORTEZ et al., Plaintiffs and Appellants, v. ERNESTO MACIAS, Defendant and Appellant.

COUNSEL

Hector J. Rosso and Marshall Miles for Plaintiffs and Appellants.

Thompson & Colegate, Leighton B. Tegland, Blanck & Lynch and Herbert F. Blanck for Defendant and Appellant.

OPINION

**TODD (R. C.), J.***—Plaintiff parents sued defendant doctor for the wrongful death of their son because of defendant's alleged malpractice. Mrs. Cortez also sued the doctor for alleged negligent and intentional infliction of emotional distress and she asked for general and punitive damages. Plaintiffs' statement of damages included $25,000 general damages and $355.83 special damages for the wrongful death action, and Mrs. Cortez claimed $100,000 general damages and $25,000 punitive damages for each of her personal causes of action.

During trial, defendant successfully moved for nonsuit on Mrs. Cortez' causes of action. Over defendant's objection, the wrongful death action went to the jury along with a jury instruction on punitive damages. The jury returned a verdict for $150,000. Both sides appeal.

*Facts:*

Plaintiffs, husband and wife, parents of four other children, were the parents of Hernan Cortez. Hernan was born on June 5, 1973. Dr. Macias, who had delivered the child, saw the child on June 15, 1973, at which time the child's health was "perfect." On the afternoon of June 18, 1973, the child was crying a lot so, at 3 p.m., the plaintiffs drove the child to see the doctor. Dr. Macias examined the child, said he knew what was wrong, and prescribed two medicines (which plaintiffs obtained after leaving the doctor's office) and aspirin. Mrs. Cortez was told by the doctor to call if the child got worse. In addition, Mrs. Cortez was told by the doctor how to administer the medicines and aspirin, and she followed his instructions. The child was getting worse so Mrs. Cortez called the doctor at 10 p.m. The doctor was not there but his wife was. Mrs. Macias prescribed tea. Mrs. Cortez gave the child tea.

*Assigned by the Chairperson of the Judicial Council.

The child did not improve. Mrs. Cortez called the doctor at 3 a.m. on June 19, advising the doctor that the child was quite sick and had a fever. The doctor prescribed two aspirin and told Mrs. Cortez to "wrap him up and try to put him to sleep." At 6 a.m., Mrs. Cortez called the doctor again, telling him that the baby was quite sick and that she was going to take him to the hospital. The doctor said that that was all right.

Mrs. Cortez took the child to La Casita Hospital where the child had been born. That hospital refused to admit the child so Mrs. Cortez took the child to Indio Community Hospital's emergency room. After a long discourse, according to Mrs. Cortez, the child's temperature was finally taken at 7:20 a.m. Mrs. Cortez attempted (begged, she testified) to have an emergency room doctor examine the child. This attempt was rejected by a nurse. Mrs. Cortez saw the baby's temperature taken twice. She was told it was very high the second time, 105 degrees or 106 degrees. Mrs. Cortez saw a suppository given to the child and, in time, observed a nurse give the child an injection in each leg, as prescribed by the doctor to the nurse over the phone. She never saw the child bathed or sponged. The child stopped crying. She was told that the baby was "okay now" and that, after she paid the bill, she could take the baby home. She and her husband went to pay the bill. When she returned, and believing that the baby was asleep, she started to pick up the baby. Her husband said to her that the baby was dead. Mrs. Cortez became hysterical. She was told to leave the room by the nurses and doctors. Her husband took her from the room. Dr. Macias never did appear at the hospital.

Mrs. Cortez was given a shot at the hospital, which made her feel numb and sleepy. Thereafter, at home, she refused to go into her son's bedroom where the crib was. She stayed in the living room for months. She did attend her son's wake and his funeral. She began receiving medical attention from a different doctor for a nervous condition, taking medication whenever she was crying, "desperate."

According to Mr. Cortez, Mrs. Cortez could not do anything for two weeks. He lost work in order to care for her for that period. She could not do house work, fix food, and she was helped in her bathing and getting dressed. She cried for over a month.

Dr. Macias never thereafter contacted plaintiffs but sent plaintiffs a bill for $20. The funeral bill was $311.58.

A friend of Mrs. Cortez testified that she had known Mrs. Cortez from 1968 or 1969, that prior to Hernan's death, Mrs. Cortez was carefree, laughing, happy and that, after the death, Mrs. Cortez was forgetful, easily upset, cried during the next two years, to the point where the witness stopped visiting Mrs. Cortez. Mrs. Cortez' mother testified that the plaintiffs moved their residence three or four years after Hernan's death and that the move had something to do with that death. The mother testified that Mrs. Cortez grieved for some time but could not say whether it was for more than a year.

According to witness Sakemi, she was the registered nurse on duty at the emergency room when the hospital events recited above occurred. The record is not exactly clear as to when the child arrived but, between 7:20 a.m. and 7:30 a.m., a rectal temperature of 104.8 degrees of the child was recorded. This witness, at 7:45 a.m., called defendant to notify him that the child was in the hospital, that Mrs. Cortez wanted the child treated and wanted the doctor to come to the hospital, and to advise the doctor of the child's temperature. The doctor responded that he was in the shower and could not come to the hospital. He prescribed medications, including Dipuron, to be given and told witness Sakemi that the mother was to bring the baby to his office at 9 a.m., as he had previously told the mother to do. Witness Sakemi gave the medications prescribed and noted in the chart the prescription of medicines by the doctor, and that the witness was to send the child "to my office at 9 a.m. whether temp. is down or not." At 8:35, the witness took the child's temperature again; it was 106.4 degrees. She tried, unsuccessfully, to reach the doctor a time or two more. The child died at 8:55 a.m.

The director of nurses called Dr. Macias shortly after the child died. She asked him to come to the hospital to talk to the parents who were very upset. He said he would not be able to come. Dr. Macias lived within two blocks of the hospital. It is not clear whether he was at home or his office when this call took place.

Dr. Root, a board certified pathologist and a pathologist for the San Bernardino County Coroner's office, concluded the cause of the child's death was a "febrile convulsion," a convulsion respiratory arrest caused by an elevated temperature; a respiratory failure. "The infant stops breathing and the heart continues to pump for a few minutes until death occurs." Because Dr. Macias prescribed a temperature-reducing drug, Dipuron, which Dr. Root testified should be used only when all other antifebrile medications have failed and only if a convulsion is ac-

tually occurring, Dr. Root concluded that Dr. Macias considered the child's condition to be "an extremely emergent situation," a situation requiring absolute immediate attention, "something that the doctor should be there for right now." Dr. Root testified that the use of the drug should have been personally monitored by Dr. Macias.

Dr. Root also testified that the child's condition involved loss of fluids, high temperature, electrolyte imbalance, and the child's inability to take in the amount of fluids necessary for control. Dr. Root stated that one of the immediate first treatments should be external cooling, followed by prevention of imbalance of electrolyte fluid and acid bases, accomplished either by intravenous injection of solutions or by hypodermoclysis (injection subcutaneously). A blood sample should have been withdrawn and tested. Dr. Root was of the opinion that, had Dr. Macias been present and had he properly treated the child, the possibility of death could have minimized and the death probably prevented.

That a temperature of 104.8 degrees Fahrenheit, rectal, was not life threatening, at least for a day or two, was uncontradicted.

Dr. Macias had indicated, in his deposition testimony entered as a part of plaintiff's case, that his June 18 diagnosis was abdominal colic and possible "flu." After he received Nurse Sakemi's telephone call, Dr. Macias revised his diagnosis. His opinion was that the "patient was in danger, possibly had bronchial pneumonia." Dr. Macias admitted telling Nurse Sakemi he was not available to come to the hospital. Dr. Root testified that he did not disagree with Dr. Macias' diagnosis of 3 p.m., June 18, that the child had colic.

The above-recited facts were before the court and jury when plaintiffs rested. Defendant moved for a nonsuit as to each of Mrs. Cortez' personal causes of action. Defendant also moved to have the punitive damage claims removed from the jury's consideration. For reasons that do not appear in the record on appeal, the trial court did not rule on these motions until the defense had completed its case.

### Negligent Infliction of Emotional Distress

Plaintiff Hermalinda Cortez has appealed the trial court's ruling which took this issue away from the jury's consideration.

The California Supreme Court, in *Dillon v. Legg* (1968) 68 Cal.2d 728, 739 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], has stat-

ed that, in order to limit the otherwise potentially infinite liability which would follow every negligent act, the law of torts holds a defendant amenable only for injuries to others which, to the defendant at the time, were reasonably foreseeable. The Supreme Court observed that "'the risk reasonably to be perceived defines the duty to be obeyed,'" citing *Palsgraf* v. *Long Island R. R. Co.* (1928) 248 N.Y. 339, 344 [162 N.E. 99, 59 A.L.R. 1253].

In *Dillon*, the Supreme Court distinguished between the tort situation where foreseeability of the risk and a breach of the attendant duty lead to actual physical impact, and the tort situation where a breach of the attendant duty affects a person, within or without the zone of physical risk, but where there is still a resulting emotional disturbance leading to bodily injury or sickness to that person because of the actor's conduct.

*Dillon* dealt with the latter situation; a mother, outside the zone of physical danger, watched her daughter being run over and killed by a vehicle, the mother thereafter suffering emotional trauma. In concluding that a mother could state a cause of action for tort liability based on such facts, the Supreme Court counseled that the trial courts are to consider such factors as (1) whether the plaintiff was near the scene of the accident or a distance away, (2) whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the impact, as contrasted with learning of the accident from others after its occurrence, and (3) whether the plaintiff and the victim were closely related, as contrasted with a distant relationship or no relationship at all.

On August 25, 1980, the California Supreme Court decided *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813]. In *Molien* it was held (five-two) that one's negligent infliction of emotional distress could be actionable when the plaintiff suffered emotional distress but suffered neither physical injury nor physical impact. There, plaintiff's wife had negligently been misinformed that she had syphilis. She was told to tell her husband, plaintiff, which she did. Plaintiff was tested, with a negative finding, and was treated. The marriage deteriorated and the plaintiff was divorced. In discussing plaintiff's right of recovery, the Supreme Court distinguished *Dillon* by pointing out that Mr. Molien was a *direct* victim of the assertedly negligent act. The three guidelines of *Dillon*, said the court, need not literally be met because, as *Dillon* also held, foreseeability "must necessarily be adjudicated only on a case by case basis" and the

obligation hinging on foreseeability is not subject to an immutable rule which establishes the extent of that obligation for every circumstance in the future. (Cf. *Dillon, supra,* 68 Cal.2d at p. 740.) The tortious conduct of the defendant, said the court in *Molien,* was directed at the plaintiff as well as his wife.

The language in *Molien* is sufficiently broad, it would appear, to permit similar reasoning to be applied to the facts of the case before us. However, in its discussion in *Molien,* the Supreme Court refers, by citation, to its 1977 *Justus* decision, without overruling, modifying or distinguishing that decision beyond the degree that that court distinguished *Dillon.*

In *Justus* v. *Atchison* (1977) 19 Cal.3d 564 [139 Cal.Rptr. 97, 565 P.2d 122], a consolidated appeal joining two similar cases, each plaintiff, a father, was in the delivery room when alleged negligent acts occurred leading to the delivery of a stillborn child. In one case (*Justus*), the father watched the manipulation of the fetus by forceps and hand, and the emergency procedures then performed on the wife in connection with an attempted Ceasarean section. In the other case (*Powell*), the father was aware of the diminution of the fetal heart tones and observed the nurse's anxiety at her inability to monitor them, and was further aware of the resulting emergency and the failure of the doctor to respond promptly when called. Each father saw the prolapsing of the umbilical cord of the fetus and observed the pain and trauma of his wife. Each father sued for negligent infliction of emotional distress.

The Supreme Court, at page 585, stated: "Whether the described events constitute negligence is questionable, but they no doubt induced a growing sense of anxiety on the plaintiff's part. Yet his anxiety did not ripen into the disabling shock which resulted from the death of the fetus until he was actually informed of that event by the doctor; prior to that moment, as a passive spectator he had no way of knowing that the fetus had died. In short, the impact derived not from what he saw and heard during the attempted delivery, but from what he was told after the fact." Judgments as to the dismissal of the causes of action were affirmed.

In a dissenting opinion, in *Austin* v. *Regents of University of California* (1979) 89 Cal.App.3d 354, 361 [152 Cal.Rptr. 420], Justice Bernard Jefferson concluded that the Supreme Court, in *Justus,* had added to the *Dillon* requirements a fourth factor to be considered,

namely, was the complaining party voluntarily or involuntarily present at the time of the alleged occurrence? According to Justice Jefferson, *Justus* held that a voluntary witness is denied any right of recovery for emotional distress.

The *Justus* case, factually, is as close a reported California appellate decision as is presently available and the statements of law set forth therein are binding. Mrs. Cortez, even if not a voluntary witness, experienced a very similar set of circumstances as did Mr. Powell in the *Justus* case. Her shock did not occur until after she returned from paying the hospital bill, at which time she thought the child was asleep, and not until she was told by her husband that Hernan was dead.

The judgment of nonsuit, made pursuant to section 581c of the Code of Civil Procedure on this cause of action is affirmed. As stated in *Hoyem* v. *Manhattan Beach City School District* (1978) 22 Cal.3d 508, 523 [150 Cal.Rptr. 1, 585 P.2d 851], "We held in *Justus* that '*Dillon* requires more than a mere physical presence: . . . the shock must also result from a "direct emotional impact" on the plaintiff caused by "sensory and contemporaneous observance of the accident."'"

### Intentional Infliction of Emotional Distress

■ Plaintiff Hermalinda Cortez has also appealed the trial court's ruling which took this issue from the jury's consideration.

■ Nonsuits, of course, may only be granted where, disregarding conflicting evidence, and giving plaintiff's evidence all the value to which it is legally entitled, indulging every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict for plaintiff. (*Vargas* v. *Ruggiero* (1961) 197 Cal.App.2d 709, 714 [17 Cal.Rptr. 568].)

In *Emden* v. *Vitz* (1948) 88 Cal.App.2d 313 [198 P.2d 696], an action for intentional infliction of emotional distress, plaintiff tenant was unjustifiably locked out of her apartment and not permitted to enter or regain her personal belongings. The apartment owner and managers, while blocking the exit from the manager's office, yelled and screamed at the plaintiff (who was then benefiting from a low rent due to government rent controls). Although no physical contact occurred, plaintiff was frightened which caused her pains about the heart, headaches, and

other physical ailments. She was awarded a money damage judgment. On appeal, the Court of Appeal, at page 319, stated: "The evidence justified a conclusion that defendants intentionally and unreasonably subjected plaintiff to severe mental distress involving a risk of causing physical harm; and by clear and uncontradicted evidence, it was proven that substantial physical injuries were actually incurred by plaintiff as a proximate result of fright engendered by the said conduct of defendants. Liability under these circumstances is manifestly correct."

In *State Rubbish Collectors Association* v. *Siliznoff* (1952) 38 Cal.2d 330 [240 P.2d 282], the victim was threatened with beatings and property damage unless he signed a business agreement. Out of fright, the victim signed. On appeal from the judgment obtained by the victim, the Supreme Court ruled that, under such circumstances, it would be anomalous to deny recovery because a defendant's intentional misconduct fell short of producing some physical injury. (Cf. *Fuentes* v. *Perez* (1977) 66 Cal.App.3d 163, 169 [136 Cal.Rptr. 275].)

▮ Thus, while Mrs. Cortez did not testify to actual suffering of bodily injury, the emotional distress she suffered is not in dispute.

The more serious issue is whether Dr. Macias' failure to come to the hospital constituted the type of conduct which can be categorized as malicious, outrageous, or unreasonable. ▮ "'Intentional infliction of emotional distress, without physical trauma, can be a ground of liability [citation], but only when the defendant's conduct is "outrageous" [citation]; or "has gone beyond all reasonable bounds of decency."'" (*Cornblith* v. *First Maintenance Supply Co.* (1968) 268 Cal.App.2d 564, 565 [74 Cal.Rptr. 216].

▮ The doctor saw the plaintiffs at 3 p.m. on June 18. He examined, diagnosed and prescribed. At 10 p.m., when Mrs. Cortez called, the doctor was not at home. At 3 a.m., June 19, the doctor talked, prescribed and was insensitive to the point of telling Mrs. Cortez that he wanted to sleep. At 6 a.m., Mrs. Cortez called the doctor to tell him that she was taking the child to the hospital, to which he agreed. At 7:45 a.m., the doctor was called by Nurse Sakemi. He prescribed, but told her that he was in the shower and could not come over to the hospital. Sometime after 8:55 a.m., the director of nurses called the doctor and told him that the child was dead. For whatever reason, but after the fact, the doctor refused to come to the hospital.

In *Fuentes, supra*, 66 Cal.App.3d at page 172, the Court of Appeal stated that it is for the trial court to determine, in the first instance, whether a defendant's conduct may reasonably be regarded as so extreme and outrageous so as to permit recovery, or whether it is *necessarily* so, but that when reasonable men may differ, it is for the jury to determine whether the conduct has been sufficiently extreme and outrageous to result in liability. (Cf. *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 499 [86 Cal.Rptr. 88, 468 P.2d 216].)

Assuming that the doctor was irritated because of the number, hour, and times of the telephone calls, and assuming that he was irritated because Mrs. Cortez decided to take the child to the hospital rather than wait until the scheduled 9 a.m. office visit, and assuming that these were the reasons that, at 7:45 a.m., he refused to come to the hospital, is that enough to submit those facts and possible inferences to the jury to let them decide whether the doctor's conduct was "outrageous"?

In *Fuentes, supra*, 66 Cal.App.3d 163, a contractor, after removing plaintiff's roof for repairs, refused to cover the roof from rain when plaintiffs warned of dire weather reports. It did rain and plaintiffs suffered severe emotional distress because of the resulting water damage to valued personal articles. The appellate court concluded that these facts were insufficient for submission to a jury on a theory of intentional infliction of emotional distress.

The *Fuentes* court had sometime earlier decided *Windeler v. Scheers Jewelers* (1970) 8 Cal.App.3d 844 [88 Cal.Rptr. 39]. In *Windeler*, plaintiff warned defendant jeweler that rings being delivered for resetting were of great sentimental value. The rings were lost by the jeweler. From the resulting emotional trauma, plaintiff sustained physical injury. She recovered a judgment for her injuries, affirmed on appeal. The *Fuentes* court, in deciding *Fuentes*, distinguished the *Windeler* case on the basis that there was a bailment contract that included an agreement by the jeweler to compensate the bailor for any distress and injuries she might suffer should something happen to the rings.

The more typical "intentional infliction of emotional distress" cases include *Alcorn v. Anbro Engineering, Inc., supra*, 2 Cal.3d 493, racial discrimination in job terminations; *Richardson v. Pridmore* (1950) 97 Cal.App.2d 124 [217 P.2d 113, 17 A.L.R.2d 929], retaliatory eviction and removal of personal belongings of a pregnant tenant; and *Bowden v.*

*Spiegel, Inc.* (1950) 96 Cal.App.2d 793 [216 P.2d 571], threats to the plaintiff accompanied by false statements of debt in front of third persons.

Mrs. Cortez did not testify that the conduct of the defendant distressed her at the time of the 3 p.m. visit the day before, or at the time she spoke with the doctor's wife later that evening, or at the time of the 3 a.m. call to the doctor, or at the time of the 6 a.m. call to the doctor. She did not express concern because the first hospital would not accept her child. She was emotionally concerned with the Indio Community Hospital (which had settled out of the case) and its staff for the delay in having the baby's temperature taken and with the nurse's refusal to call in the emergency doctor. The defendant was called shortly after the first temperature reading. Plaintiff was aware that the doctor had ordered an injection. Inferentially, she was not emotionally disturbed by the defendant by that set of circumstances. The child stopped crying after the injection. Plaintiff was told the child was "OK." She paid the bill, learned of the child's death, and the emotion set in.

The facts adduced in evidence in the case at bar were insufficient to justify jury determination of this cause of action. The judgment of nonsuit is affirmed.

■ *Insufficiency of the Evidence to Support the Verdict*

After the trial court eliminated Mrs. Cortez' personal claims from jury consideration, the court submitted the wrongful death action to the jury. That action was based on the doctor's alleged malpractice. Medical malpractice is the breach by a physician of the duty of care he owes his patient, i.e., negligence. (BAJI No. 6.00 (6th ed.) as submitted to the jury.)

No witness challenged the quality of the services actually performed by the doctor. Plaintiffs' challenge is based upon the doctor's failure to perform, i.e., abandonment. Therefore, asserts the defendant doctor, in *any* malpractice case, negligence on the part of the doctor must be proved, and will not be presumed (in the absence of res ipsa loquitur circumstances). (*Lamb* v. *Moore* (1960) 178 Cal.App.2d 819, 822 [3 Cal.Rptr. 507].) Further, says defendant, only an expert witness, specializing in the field involved, can provide the necessary evidence to justify the jury's finding of actionable negligence.

Plaintiff's expert witness, Dr. Root, although a specializing pathologist, had had a "family practice" as a flight surgeon in the military service. He had also acquired a one-year internship in surgical pediatrics. Dr. Root did not disagree with defendant's diagnosis, colic, on June 18, but expressed his opinion that the child was not well on that date. Dr. Root inferred, because of defendant's prescription for use of Dipuron at 7:45 a.m. on June 19, that defendant had diagnosed an emergency situation which should have called for immediate patient follow-up by the defendant. Dr. Root did not testify that any qualified individual would have been able to accurately diagnose the child's medical problem as of the time of the emergency, but Dr. Root *did* testify that, had defendant made an appearance and had defendant properly treated the child for the symptoms then known, there was a high possibility and probability of prevention of the child's death. None of these opinions were objected to at the trial by defendant, either on the basis of a lack of foundation of the witness' qualifications or for insufficiency of the evidence. (Cf. *Thomas* v. *Seaside Memorial Hospital* (1947) 80 Cal.App.2d 841 [183 P.2d 288].)

The issue is one of weight, not admissibility. As the Supreme Court stated, in *Brown* v. *Colm* (1974) 11 Cal.3d 639, 645 [114 Cal.Rptr. 128, 522 P.2d 688], "The unmistakeable general trend in recent years has been toward liberalizing the rules relating to the testimonial qualifications of medical experts."

The evidence was sufficient to support the jury's finding of the defendant's liability.

In connection therewith, defendant urges that "Jury Instruction—B," read to the jurors, was an incorrect statement of the law as it applied to a physician's continuing duty of care. As a formula instruction[1] it was not an adequate or complete statement of the applicable law, but in context with the remaining jury instructions, any error committed by its use was harmless. (*Rising* v. *Veatch* (1931) 117 Cal.App. 404 [3 P.2d 1023]; *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 58 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].

---

[1]The instruction read: "A physician, in the absence of an agreement to the contrary, is, during the existence of the relationship of physician and patient, under a duty to give to the patient all necessary care as long as the case requires attention, and an unwarranted lack of diligence in attending the patient after assumption of the case for treatment renders the physician liable for damages resulting therefrom."

■ *The Jury Instruction on Punitive Damage Awards*

Plaintiffs' case went to the jury on one theory, negligence of the doctor. The trial court, as a part of its instruction on the law, told the jury what the measure of damages were in the case of the death of a minor, that pleadings and argument are not evidence of reasonable compensation, that the jury was not to take a cue from the judge, that speculative damages were not permitted, that all instructions are not necessarily applicable, and the court read to the jury an instruction on punitive damages, BAJI No. 14.71.[2]

The jury, of course, had heard testimony, as a part of plaintiffs' case in chief, of the emotional distress of Mrs. Cortez. In addition, the defendant was impeached relative to his recollection of treatment. Plaintiffs' counsel, in closing argument, advised the jury that the jury could award punitive damages to punish. He suggested no amount for general or special damages, telling the jury that this was within their discretion "tempered by judgment." In rebuttal closing argument, plaintiffs' counsel again discussed punitive damages, "that will be up to you." While deliberating, the jury had the court read back the punitive damage instruction. The reporter's transcript shows that the jury was much concerned about the issue. The jury submitted a note: "If only six jurors vote for punitive damages and six vote nay, are we then forced to consider punitive damages?"

After conference with counsel, the court decided to, and did, read BAJI No. 14.71 to the jury again.

---

[2]The instruction read: "If you find that plaintiff suffered actual damage as a proximate result of the conduct of the defendant on which you base a finding of liability, you may then consider whether you should award additional damages against defendant for the sake of example and by way of punishment. You may in your discretion award such additional damages, known as punitive or exemplary damages, if, but only if, you find by a preponderance of the evidence that said defendant was guilty of oppression or actual malice in the conduct on which you base your finding of liability.

"'Malice' means a motive and willingness to vex, harass, annoy, or injure another person. Malice may be shown by direct evidence of declarations of hatred or ill-will or it may be inferred from acts and conduct, such as by showing that the defendant's conduct was wilful, intentional, and done in reckless disregard of its possible results.

"'Oppression' means subjecting a person to cruel and unjust hardship in conscious disregard of his rights.

"The law provides no fixed standard as to the amount of such punitive damages, but leaves the amount to the jury's sound discretion, exercised without passion or prejudice."

The jury returned with a verdict of $150,000 for compensatory damages (the exact amount suggested by plaintiffs' counsel in his rebuttal closing argument) and "0" by way of punitive damages. The jury vote to find liability and to award compensatory damages was nine to three, the vote being six to six on an award of punitive damages.

Defendant contends that instructing on the law of punitive damages was prejudicial error, under these circumstances. (Cal. Const., art. VI, § 13.) It is noted, too, that no evidence was presented by plaintiffs to support an award of any amount by way of general damages. While the law does not require it, no evidence (other than the fact that the defendant was a doctor) was presented in support of an award of punitive damages in any amount.

Section 3294 of the Civil Code[3] authorizes an award of punitive damages, for the sake of example and to punish, where a defendant has been guilty of oppression, fraud or malice. In *G. D. Searle & Co. v. Superior Court* (1975) 49 Cal.App.3d 22, 32 [122 Cal.Rptr. 218], the Court of Appeal, in essence and in relation to section 3294, observed that, "'[i]n order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice. [Citation.] He must act with the intent to vex, injure or annoy, *or with a conscious disregard of the plaintiffs' rights.*'" (Italics added.)

Historically, actionable negligence did not justify an award of punitive damages. As the Supreme Court stated, in *Donnelly v. Southern Pacific Company* (1941) 18 Cal.2d 863, 869 [118 P.2d 465], "If conduct is negligent, it is not willful; if it is willful, it is not negligent." That court also stated, at page 869, "A negligent person has no desire to cause the harm that results from his carelessness [citation], and he must be distinguished from a person guilty of willful misconduct . . . ."

In view of *Searle, supra*, 49 Cal.App.3d 22, and *Nolin v. National Convenience Stores, Inc.* (1979) 95 Cal.App.3d 279 [157 Cal.Rptr. 32], it is arguable that the punitive damage instruction was appropriate. However, we need not decide the issue in the light of those cases.

---

[3]"In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

Punitive damages are not permitted in wrongful death actions. (*Lange* v. *Schoettler* (1896) 115 Cal. 388, 390 [47 P. 139].)

In *Pease* v. *Beech Aircraft Corp.* (1974) 38 Cal.App.3d 450, 462 [113 Cal.Rptr. 416], the Court of Appeal stated, "We refuse, therefore, to exercise legislative powers to declare a right to punitive damages in favor of the heirs." The Supreme Court thereafter denied plaintiff heirs a hearing in *Pease.* As of this date, the Legislature has not amended section 376 or 377 of the Code of Civil Procedure, or section 573 of the Probate Code, in any way which might justify an award of punitive damages. (Cf. *Umansky* v. *Urquhart* (1978) 84 Cal.App.3d 368, 371-372 [148 Cal.Rptr. 547]; *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 450 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].)

On the basis of the above-recited facts, it is clear that, under present law, it was error to instruct the jury on the issue of punitive damages. Whether or not standing alone this error was prejudicial is a question we need not resolve, because there is at least one other serious error impinging on the issue of damages, and in combination these errors require a new trial limited to the issue of damages.

### Other Claimed Errors Related to the Damage Award

For reasons not shown in the record, plaintiffs did not serve a statement of damages on defendant until the day before closing arguments.[4] The demand for the wrongful death was $25,000 general damages and $355.83 special damages. The jury was not told of plaintiffs' statement of damages. Plaintiffs' counsel did not mention a dollar figure in his closing argument, nor did defendant's counsel. In his rebuttal closing argument, for the first time, and over defense counsel's timely objection to the trial judge, plaintiffs' counsel argued to the jury that $150,000 would be a reasonable figure for general damages. Defendant contends that the statement was improper rebuttal and that the amount suggested and returned cannot stand because it exceeds the amount claimed in the statement of damages.

---

[4]Section 425.10, subdivision (b) of the Code of Civil Procedure, prohibits a plaintiff from including in the complaint a statement of the amount of money damages claimed in the superior court where the action is for personal injury or wrongful death. By virtue of section 425.11, Code of Civil Procedure, a defendant is permitted to request of the plaintiff a statement of the amount of damages claimed. When a defendant fails to make that request, the section provides that the plaintiff *shall* give notice to the defendant of the amount of special and general damages claimed where, as here, the defendant has filed an answer at least 60 days before trial. The statutes do not state

We agree with defendant that it was error to permit plaintiffs' counsel over objection to argue for the first time in rebuttal argument that a specific sum should be awarded as general damages. Defendant was thereby deprived of an opportunity to challenge that figure (see Code Civ. Proc., § 607, subd. 7), and inasmuch as the jury returned a verdict in precisely the figure argued for by plaintiffs' counsel, prejudice is evident.

This court observes that plaintiffs contend that the trial court erred in granting the nonsuits, thereby bypassing the "one judgment" rule. There was no error. Mrs. Cortez was claiming a singular and personal recovery for injury to her and the relief sought was sought by her alone. *Estate of Jamison* (1953) 41 Cal.2d 1, 5 [256 P.2d 984], is to be distinguished. (4 Witkin, Cal. Procedure (2d ed. 1971) § 350, p. 3150.)

We find it unnecessary to reach the question whether a plaintiff may recover a verdict in excess of the amount demanded in the plaintiffs' statement of damages in the absence of leave to amend the statement. (See and cf. *Meisner* v. *McIntosh* (1928) 205 Cal. 11, 13 [269 P. 612]; *Singleton* v. *Perry* (1955) 45 Cal.2d 489, 499 [289 P.2d 794]; *Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 470 [136 Cal.Rptr. 653].) The rebuttal argument error together with the error in instructing on punitive damages require reversal for a new trial on the issue of damages only. On the limited retrial, the judgment may be corrected to run in favor of both plaintiffs. (*Molien* v. *Kaiser Foundation Hospitals, supra*, 27 Cal.3d at p. 921.) The remaining issues do not require discussion.

The judgment is reversed for the limited purpose of permitting a retrial on the issue of damages only.

In the interests of justice, the parties shall bear their own respective costs on appeal.

Kaufman, Acting P. J., and McDaniel, J., concurred.

A petition for a rehearing was denied October 16, 1980, and on October 23, 1980, the opinion was modified to read as printed above. The petition of plaintiffs and appellants for a hearing by the Supreme Court was denied November 26, 1980. Bird, C. J., was of the opinion that the petition should be granted.

---

what penalty or other effect results from a failure to timely give such notice. In any event, however, so far as the record indicates, defendant made no issue of the tardiness of plaintiffs' notice, and any defect as to timeliness was therefore waived.