[Civ. No. 6967. Fifth Dist. Oct. 28, 1983.]

ARLYN R. KATELY et al., Cross-complainants and Appellants, v. BARTON R. WILKINSON et al., Cross-defendants and Respondents.

578

## COUNSEL

Allen, Ivey, Cornell, Mason & Castellucci, Allen, Cornell & Mason, Nancy I. Smith and Donald J. Proietti for Cross-complainants and Appellants.

Kroloff, Belcher, Smart, Perry & Christopherson and Christopher Engh for Cross-defendants and Respondents.

## OPINION

**HAMLIN, J.—**

### THE CASE

In this wrongful death action, each of the users of the boat which caused the death of plaintiffs'[1] daughter in a water-skiing accident filed cross-com-

---

[1]Plaintiffs, James Stanley Clouse and Darlene Sharon Clouse initially filed an action for the wrongful death of their daughter, Rhonda, against Arlyn Kately, Cecil's Marine and F. M. Marine. Because plaintiffs' causes of action are unaffected by the disposition of Kately's cross-complaint, they are not a party to this appeal.

plaints. This is an appeal from the judgments of dismissal[2] after demurrers were sustained to the cross-complaints[3] without leave to amend. It requires us to construe the third guideline articulated in *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], governing foreseeability of emotional trauma through sensory perception of physical injury negligently inflicted upon another, i.e., that the plaintiff and the victim be closely related. It also concerns the right of the user of a defective product to recover damages for emotional trauma which the user sustains through sensory perception of injury to another caused by the defect in the product he is using.

We conclude that where, as here, the relationship is not a family relationship but one akin to a family relationship because of friendship and past associations, the relationship guideline is not satisfied. However, we con-

---

[2]The trial court entered one judgment dismissing Rebecca's cross-complaint and Kately's eighth cause of action and another dismissing Kately's fourth through seventh causes of action. Because Kately's first three causes of action were unaffected by the demurrer and the judgments of dismissal were improvidently entered as to Kately's causes of action on which a demurrer was sustained without leave to amend, neither judgment is a final appealable judgment as to Kately. (*U. S. Financial* v. *Sullivan* (1974) 37 Cal.App.3d 5 [112 Cal.Rptr. 18].) However, after oral argument the parties filed a written stipulation that we may treat the record as a petition by Kately for a writ of mandate. The same considerations justifying acceptance of the stipulation in *U. S. Financial* v. *Sullivan* are present in this case. "[T]he propriety of the trial court's ruling [on the demurrers] has been briefed by both parties and the trial of the case has already been delayed pending this appeal." (*Id.*, at p. 11.) We therefore accept the stipulation to permit disposition of procedural problems in a businesslike fashion in the interests of justice and to prevent unnecessary delay. (*Clovis Ready Mix Co.* v. *Aetna Freight Lines* (1972) 25 Cal.App.3d 276, 281 [101 Cal.Rptr. 820].)

[3]The cross-complaint filed by the owner and operator of the boat, Arlyn Kately (Kately), alleged eight separate causes of action. The first three causes of action were against Barton R. Wilkinson and John R. Granckow, individually and doing business as Cecil's Gateway Marine (Gateway), the seller of the boat; F. M. Marine (Marine), the manufacturer and distributor of the boat; and Bank of America, the entity which provided financing for the sale of the boat. The first cause of action was for rescission of the contract of sale of the boat on the ground of intentional misrepresentation; the second was for compensatory damages for negligent misrepresentation; and the third was for exemplary damages for intentional misrepresentation. Kately's remaining causes of action were against Gateway and Marine. The fourth cause of action was for negligence in the manufacture of the boat; the fifth was for breach of express warranty; the sixth was for breach of warranty of merchantability; the seventh was for products liability; and the eighth was for negligent infliction of emotional distress caused by Kately's witnessing the death of plaintiffs' daughter, Rhonda, a person Kately considered as a daughter. The damages alleged in the fourth through seventh causes of action were emotional and mental damages resulting from the death of Rhonda as to whom there existed a relationship akin to that of a mother and daughter with Kately.

Kately, as guardian ad litem for her minor daughter, Rebecca, the observer of Rhonda as she was being towed by the boat, cross-complained against Gateway and Marine for negligent infliction of emotional distress because Rebecca witnessed the death of Rhonda, Rebecca's best friend and a person she considered and treated as a sister.

The trial court sustained a demurrer to Rebecca's cause of action without leave to amend.

Similarly, the trial court sustained a demurrer to Kately's fourth through eighth causes of action without leave to amend.

clude that where, as here, the complainants are using a defective product for the purpose and in the manner intended and the product causes injury to another because of the defect, the users may state a cause of action for emotional trauma they sustain through sensory perception of the injury thus inflicted.

## THE FACTS

We take the statement of facts from the pleadings. This is proper because "[r]espondent's [Gateway's and Marine's] demurrer is to be treated as admitting the truthfulness of all properly pleaded factual allegations of the complaint, but not contentions, deductions or conclusions of fact or law. [Citations omitted.]" (*Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 827-828 [134 Cal.Rptr. 839].)

On May 31, 1980, Kately purchased a boat and trailer from Gateway. Bank of America provided financing for the purchase.

A few months later Kately, Rebecca and Rhonda took the boat out to water-ski, a purpose for which the boat was purchased and intended. While Rhonda was being towed as a skier, the steering column on the boat locked. This made it impossible to steer the boat. As a result the boat circled in the water and struck Rhonda's body.

The impact with the boat partially dismembered Rhonda's leg, the leg being three-quarters severed from her body. Additionally, the impact tore deep lacerations in Rhonda's breast area; it tore a deep laceration in her abdomen, resulting in partial evisceration; it also tore a deep laceration in the groin area and five deep lacerations in Rhonda's left thigh and leg.

Kately was operating the boat at the time the steering column locked, causing the impact with Rhonda. At the same time Kately's daughter, Rebecca, was in the back of the boat observing Rhonda while the boat was towing her. After the impact, Kately and Rebecca climbed into the water to aid Rhonda, and they succeeded in pulling her back into the boat. In the course of the rescue, Rebecca inadvertently thrust her hand into Rhonda's body through one of her wounds. Rhonda was still alive when she was pulled from the water, but because of the locked steering column, Kately was unable to operate the boat. Kately and Rebecca were compelled to sit with Rhonda in her badly mutilated condition as the boat circled in the water. Rhonda died as a result of her injuries.

Rhonda and Rebecca were both 14 years old at the time of the accident. They were best friends and were frequently in each other's company, in

each other's homes, and together on social and recreational outings. Rhonda was treated as a "filial member" of the Kately family, and Rebecca loved Rhonda, cared for her, and held her life as dear as she would have a natural sister.

The relationship between Kately and Rhonda was very much akin to that of mother and daughter. Kately loved Rhonda and cared for her and held her life as dear as she did that of her natural daughter.

As a result of witnessing the fatal injuries to Rhonda, both Kately and Rebecca sustained great emotional disturbance, and shock and injury to the nervous system, which caused and continues to cause great physical and mental pain and suffering. Kately awakens screaming from nightmares, reliving the incident. She is unable to retain her composure when discussing the incident. She has consulted and continues to consult a psychiatrist as a result of her overwhelming emotional problems caused by this accident.

## DISCUSSION

On appeal from a demurrer sustained without leave to amend, the standard of review is well settled. ■ It is an abuse of discretion to sustain a demurrer without leave to amend unless the facts and nature of the complainant's claim are clear and under the substantive law no liability exists or it is probable from the nature of the defects and previous unsuccessful attempts to plead that complainants cannot state a cause of action. (*Haskins* v. *San Diego County Dept. of Public Welfare* (1980) 100 Cal.App.3d 961, 964-965 [161 Cal.Rptr. 385].)

With respect to Kately's eighth cause of action and Rebecca's cause of action which are both based on mere observance of the injuries sustained by Rhonda, the pivotal issue is whether as a matter of law the relationships alleged between Kately and Rhonda and between Rebecca and Rhonda is insufficient to sustain such causes of action for the resultant emotional injury.

■ I. *Can cross-complainants state a cause of action for negligent infliction of emotional distress, based upon witnessing the death of a third party, when they are not related to the third party by blood or marriage?*

The existence of a cause of action for emotional trauma and physical injury resulting from witnessing the infliction of death or injury on a third party was first recognized by the California Supreme Court in *Dillon* v. *Legg, supra,* 68 Cal.2d 728. In that case a mother was allowed to recover

damages for the shock, emotional distress and physical injuries she sustained when she witnessed a car strike and kill her minor child. The Supreme Court rejected defendant's contention that he was not liable because he owed no duty to the plaintiff. The court pointed out, "In the absence of 'overriding policy considerations . . . foreseeability of risk [is] of . . . primary importance in establishing the element of duty.' [Citations omitted.]" (*Id.*, at p. 739.) The court went on to state: "In determining . . . whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (*Id.*, at pp. 740-741.)

The application of the factors just stated to the case being considered and to cases which arise in the future is explained later in the opinion as follows: "We are not now called upon to decide whether, in the absence or reduced weight of some of the above factors, we would conclude that the accident and injury were not reasonably foreseeable and that therefore defendant owed no duty of due care to plaintiff. In future cases the courts will draw lines of demarcation upon facts more subtle than the compelling ones alleged in the complaint before us." (*Id.*, at p. 741.)

In the instant case we are concerned only with the third factor articulated in *Dillon* v. *Legg, supra,* 68 Cal.2d 728 since the first two are clearly satisfied by the allegations of the cross-complaint. Nevertheless, we receive guidance in applying the third factor by considering the multitude of cases construing the second factor, i.e., whether the shock resulted from a direct emotional impact upon the complainant from the sensory and contemporaneous observance of the accident.

Initially we note that more cases numerically have denied recovery to plaintiffs upon a determination that the observance of the accident was not contemporaneous with the accident itself than have permitted plaintiffs to proceed with their causes of action when the satisfaction of this factor is less than absolute. For those cases holding in favor of the plaintiff, see, e.g., *Krouse* v. *Graham* (1977) 19 Cal.3d 59 [137 Cal.Rptr. 863, 563 P.2d 1022]; *Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553 [145 Cal.Rptr. 657]; *Archibald* v. *Braverman* (1969) 275 Cal.App.2d 253 [79 Cal.Rptr. 723]; for those cases denying the plaintiffs recovery, see, e.g., *Hoyem* v.

*Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 522-523 [150 Cal.Rptr. 1, 585 P.2d 851]; *Justus* v. *Atchison* (1977) 19 Cal.3d 564 [139 Cal.Rptr. 97, 565 P.2d 122]; *Cortez* v. *Macias* (1980) 110 Cal.App.3d 640, 648-649 [167 Cal.Rptr. 905]; *Hathaway* v. *Superior Court* (1980) 112 Cal.App.3d 728 [169 Cal.Rptr. 435]; and *Arauz* v. *Gerhardt* (1977) 68 Cal.App.3d 937 [137 Cal.Rptr. 619].

In certain of these cases, e.g., *Hoyem* v. *Manhattan Beach City Sch. Dist.*, *supra,* 22 Cal.3d 508, the plaintiff gained knowledge about the accident from a third party at some time after the occurrence of the accident and did not actually observe the traumatic results at the scene; this would seem to be well outside the second *Dillon* guideline. However, more difficult to reconcile are those cases, such as *Hathaway* v. *Superior Court*, *supra,* 112 Cal.App.3d 728, in which the plaintiff, generally a parent, has come upon the scene of the accident within moments of its occurrence, observing the immediate results of the injury sustained by the child, but nevertheless has been denied recovery because of the noncontemporaneous perception of the accident.

This strict construction of the second guideline articulated in *Dillon* persuades us that the third guideline should be equally strictly construed. The two California cases which have considered the third *Dillon* guideline are generally consistent with this principle of strict construction. In the earlier case, *Mobaldi* v. *Regents of University of California* (1976) 55 Cal.App.3d 573 [127 Cal.Rptr. 720], disapproved on other grounds in *Baxter* v. *Superior Court* (1977) 19 Cal.3d 461, 466 [138 Cal.Rptr. 315, 563 P.2d 871], the emotional attachments of the family relationship were considered more relevant to foreseeability than legal status. In that case the plaintiff foster mother had held her foster son in her arms while personnel of defendant hospital negligently administered a glucose solution 10 times the safe strength. The child was about three and a half years old and had been in plaintiff's care since he was five months old. While plaintiff was holding the child, he went into convulsions and became comatose; he suffered irreversible brain damage and was made permanently blind and quadraplegic, severely retarded and subject to seizures. Defendant's demurrer had been sustained without leave to amend, in part based on the absence of a close relationship within *Dillon* v. *Legg* guidelines. The appellate court reversed because it concluded that the relationship of foster mother and child possessed all of the incidents of that between a natural parent and child except those flowing as a matter of law (such as inheritance), which are essentially irrelevant to considerations limiting recovery in tort. (*Mobaldi, supra,* at pp. 582-583.)

In the later case, *Drew* v. *Drake* (1980) 110 Cal.App.3d 555 [168 Cal.Rptr. 65], the appeal was also from a judgment entered on a demurrer

sustained without leave to amend based upon the plaintiff's failure to state a cause of action for emotional distress although she witnessed the killing in an auto accident of the man with whom she had lived for three years as a de facto spouse. The appellate court affirmed and stated: "Emotional distress to a spouse [citation omitted] or a parent [citation omitted] witnessing an injury to spouse or child meets the *Dillon* test because it is reasonably foreseeable that a person standing in such close relationship to the injured person may be present and suffer intense distress. No reported decision extends the 'close relationship' guideline to include friends or housemates. . . . To allow persons standing in a 'meaningful relationship' (to use a contemporary colloquialism) to recover for emotional distress resulting in physical injury would abandon the *Dillon* requirement that '[t]he courts . . . mark out the areas of liability, excluding the remote and unexpected.' [Citation omitted.]" (*Id.*, at p. 557.)

The court in *Drew* v. *Drake, supra,* 110 Cal.App.3d 555 distinguished *Mobaldi* v. *Regents of University of California, supra,* 55 Cal.App.3d 573, on the basis that, in *Mobaldi,* the doctor treating the child victim knew of the foster parent relationship between the victim and the plaintiff and treated plaintiff as the victim's mother.

Although we are aware of several cases from jurisdictions other than California which suggest a more liberal construction of the third guideline articulated by *Dillon* v. *Legg* (see, e.g., *Leong* v. *Takasaki* (1974) 55 Hawaii 398 [520 P.2d 758, 94 A.L.R.3d 471]; *Beanland* v. *Chicago, Rock Island & Pacific Railroad Co.* (8th Cir. 1973) 480 F.2d 109; *Norwest* v. *Presbyterian Intercommunity Hosp.* (1982) 293 Oregon 543 [652 P.2d 318]; *Haught* v. *Maceluch* (5th Cir. 1982) 681 F.2d 291); nonetheless, the public policy limitation on loss shifting inherent in the *Dillon* v. *Legg* guidelines remains as significant under present conditions as the duty imposed on the courts by *Dillon* to assess foreseeability on a case-by-case basis. Therefore, the courts in California which have been called upon to construe the *Dillon* guidelines as they relate to foreseeability, when the satisfaction of one or more of them was less than absolute, have construed them strictly.

Although on first reading, the decision in *Mobaldi* v. *Regents of University of California, supra,* 55 Cal.App.3d 573 appears to be a significant exception to the policy of strict construction, careful analysis of the facts in *Mobaldi* dictate a contrary conclusion. Defendant hospital had on previous visits referred to the plaintiff and the victim as mother and child, and that reference was constantly repeated in the hospital's records. As far as the defendant hospital was concerned, foreseeability turned upon the relationship of mother and child. Therefore, we conclude it is not reasonable to foresee severe emotional trauma being sustained by a complainant who,

without any position in the family circle of the victim, has an attachment derived from association with the victim as a friend. We know of no case which has reached that result or which has suggested a logical or reasonable basis for doing so. To allow persons having a relationship to the victim "akin to a family relationship" to recover for emotional distress caused by witnessing the injury to the victim would abandon the *Dillon* v. *Legg* requirement that the courts mark out the areas of liability excluding the remote and unexpected. (See *Drew* v. *Drake, supra,* 110 Cal.App.3d at p. 557.)

If we err in construing the "close relationship" guideline of *Dillon* v. *Legg* as requiring a relationship at least legally cognizable, even if not one of blood or marriage (*Mobaldi* v. *Regents of University of California, supra,* 55 Cal.App.3d 573), then it is for the Supreme Court to expand the rationale of *Dillon.*

We conclude that the demurrer of Gateway to Kately's eighth cause of action in her cross-complaint against Gateway and Marine, based on allegations that she suffered emotional trauma damages from witnessing the death of Rhonda, was properly sustained without leave to amend. Gateway's demurrer to Rebecca's cross-complaint containing essentially the same allegations was properly sustained for the same reasons. However, in the second section of this opinion we point out why the trial court abused its discretion in sustaining the demurrer to Rebecca's cross-complaint without leave to amend.

II. *Can the user of a defective product recover damages for emotional trauma the user sustains through sensory perception of injury to another caused by the defect in the product he is using?*

In the fourth through seventh causes of action, cross-complainant Kately seeks to recover damages for her emotional trauma suffered when the boat she was operating malfunctioned and killed Rhonda Clouse. Kately contends the injuries asserted in these four causes of action are not bystander injuries governed by the rule of *Dillon* v. *Legg.* Instead, she asserts, they are direct injuries sustained as a result of the product defect. Gateway argues that, because the emotional injuries arose from the death of another, each such cause of action must be a bystander case notwithstanding Kately's operation of the instrumentality causing the death.

The dispute between the parties requires us to resolve four underlying issues. First, can Kately recover damages for emotional trauma under causes of action for negligent manufacture, products liability and breach of express or implied warranty? Second, are damages for emotional trauma un-

accompanied by physical damages recoverable under those same causes of action? Third, do the guidelines articulated in *Dillon* v. *Legg* limit recovery in those actions? Finally, were Kately's injuries a direct result of the product defect or did they arise through Kately's status as a bystander? We will consider those issues seriatim.

■ Under applicable case law, damages for physical injuries resulting from emotional shock can be recovered in a suit premised upon products liability and related causes of action, such as breach of express or implied warranty. (*Shepard* v. *Superior Court* (1977) 76 Cal.App.3d 16 [142 Cal.Rptr. 612].)

After the decision in *Shepard* v. *Superior Court, supra,* 76 Cal.App.3d 16, the Supreme Court in *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] reviewed the history of the traditional rule that there can be no recovery for the negligent infliction of emotional distress alone and the justification for that rule. It concluded: "In our view the attempted distinction between physical and psychological injury merely clouds the issue. The essential question is one of proof; whether the plaintiff has suffered a serious and compensable injury should not turn on this artificial and often arbitrary classification scheme. . . . 'In cases other than where proof of mental distress is of a medically significant nature, [citations] the general standard of proof required to support a claim of mental distress is some guarantee of genuineness in the circumstances of the case. [Citation.]' [Citation.] This standard is not as difficult to apply as it may seem in the abstract. As Justice Traynor explained in this court's unanimous opinion in *State Rubbish etc. Assn.* v. *Siliznoff* [(1952)] 38 Cal.2d [330,] at page 338, the jurors are best situated to determine whether and to what extent the defendant's conduct caused emotional distress, by referring to their own experience. In addition, there will doubtless be circumstances in which the alleged emotional injury is susceptible of objective ascertainment by expert medical testimony. [Citation.] To repeat: this is a matter of proof to be presented to the trier of fact. The screening of claims on this basis at the pleading stage is a usurpation of the jury's function." (*Id.,* at pp. 929-930.) We cannot conceive of any reasonable basis for applying a different rule in a cause of action for negligence than that applied in causes of action for products liability and breach of express and implied warranty. The injury complained of is as much a foreseeable consequence of the negligence of the driver on the one hand as of the defect in design and manufacture on the other. (See *Shepard* v. *Superior Court, supra,* 76 Cal.App.3d at pp. 20-21.)

In *Molien* v. *Kaiser Foundation Hospitals, supra,* 27 Cal.3d 916, the Supreme Court also distinguished between bystander injuries, governed by

*Dillon* v. *Legg, supra,* 68 Cal.2d 728, and direct injuries, i.e., those in which the defendant's negligence is foreseeably directed toward the person asserting a claim for emotional distress. There, the plaintiff's wife had gone to defendant hospital for a routine physical exam, in the course of which she was negligently and incorrectly diagnosed as having syphilis. The hospital instructed the plaintiff's wife to tell her husband of the diagnosis so that he could be properly tested for the disease. As a result of the test, it was revealed that the plaintiff did not have syphilis, but because of the negligent diagnosis the plaintiff's wife became "upset and suspicious that he [her husband] had engaged in extramarital sexual activities; tension and hostility arose between the two, 'causing a break-up of their marriage and the initiation of dissolution proceedings.'" (*Molien, supra,* at p. 920.) The defendants relied upon the fact that the plaintiff was not present at the time his wife was negligently diagnosed but only learned of the diagnosis later from his wife. The Supreme Court determined that the case of *Dillon* v. *Legg* was apposite, but not controlling. Distinguishing *Dillon,* the Supreme Court stated: "Here, by contrast, plaintiff was himself a direct victim of the assertedly negligent act. By insisting that the present facts fail to satisfy the first and second of the *Dillon* criteria, defendants urge a rote application of the guidelines to a case factually dissimilar to the bystander scenario. In so doing, they overlook our explicit statement in *Dillon* that an obligation hinging on foreseeability 'must necessarily be adjudicated only on a case-by-case basis. . . . [N]o immutable rule can establish the extent of that obligation for every circumstance in the future.' (68 Cal.2d at p. 740.)

"Hence the significance of *Dillon* for the present action lies not in its delineation of guidelines fashioned for resolution of the precise issue then before us; rather, we apply its general principle of foreseeability to the facts at hand, much as we have done in other cases presenting complex questions of tort liability. (See, e.g., *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434-435 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]; *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 399-400 [115 Cal.Rptr. 765, 525 P.2d 669].)" (*Molien* v. *Kaiser Foundation Hospitals, supra,* 27 Cal.3d at p. 923.)

From *Shepard* v. *Superior Court, supra,* 76 Cal.App.3d 16 and *Molien* v. *Kaiser Foundation Hospitals, supra,* 27 Cal.3d 916 we conclude that Kately's right to recover in the instant case depends upon whether her injuries were a direct result of the use of the defective product or arose by virtue of her status as a bystander at the scene of the accident.

Under the rationale of *Molien* we believe Gateway and Marine should reasonably have foreseen that Kately, as the purchaser and an operator of the defective boat, would suffer emotional distress when the boat

malfunctioned and killed or injured another human being. Such distress is foreseeable regardless of the relationship between the plaintiff/operator of the boat and the victim. It is clearly predictable that the user of a defective product will feel guilt and responsibility for the injury or death of another notwithstanding that the actual cause was the malfunction of the product he was using. Such feelings of guilt and responsibility are foreseeably an integral part of resultant emotional distress and suffering caused by the product malfunction. This is not a type of emotional harm which people should be expected to absorb for their own good and that of society. The guarantee of the genuineness of Kately's emotional distress lies in the circumstances of the case. The user of a defective product is not a mere bystander but a primary and direct victim of the product defect; this is true whether the defective product directly and immediately injures the user or severely harms another while being operated by the user; it is equally true whether the user suffers physical or emotional injuries.

We therefore conclude that the trial court erred in sustaining the demurrer of Gateway to Kately's fourth through seventh causes of action alleged in her cross-complaint against those cross-defendants.

■ This conclusion requires us to consider whether the trial court abused its discretion in sustaining the demurrer of Gateway to Rebecca's cross-complaint without leave to amend. Rebecca's cross-complaint alleged only that she was a rider in the boat at the time the boat's steering gear malfunctioned. That allegation is insufficient to bestow upon Rebecca the status of a user of the defective product as distinguished from a mere bystander subject to the guidelines established in *Dillon* v. *Legg*.

A mere passenger in any defective vehicle or craft is not a user who would *foreseeably* suffer emotional injuries, as discussed above, when the product defect causes severe injury or death to a third party. Thus, the reasons for applying the *Dillon* guidelines to limit recovery by "riders" on a negligently constructed passenger train, airplane or ocean liner for emotional distress sustained from witnessing injuries to others are only slightly less compelling than for applying those guidelines to bystanders generally. (See, e.g., Prosser, The Law of Torts (4th ed. 1971) at pp. 334-335.) However, Rebecca was never afforded any opportunity to amend her cross-complaint. From the facts alleged it is apparent she was the person in the boat in addition to the operator who was responsible for observing Rhonda while the boat was towing Rhonda, a water-skier. The provisions of Harbors and Navigation Code section 658 *require* the presence of such a person at least 12 years of age in a position to observe the progress of the person being towed. In view of that code section, Rebecca should have been afforded the opportunity to amend her cross-complaint to allege it was reasonably foreseeable that the

boat would be used to tow a water-skier and, in that event, there would necessarily be a second person in the boat who had a responsibility of care to the victim and who was actively involved in the control and safe operation of the boat. It was certainly foreseeable that Rebecca, who undertook this duty, would witness any injury to the water-skier. Moreover, it was foreseeable that she also would suffer emotional distress from witnessing injury to the skier for whom she was the responsible observer, and that her feelings of guilt and responsibility for the injury would be severe and debilitating notwithstanding the knowledge of the actual cause of the injury, i.e., the malfunction of the boat. Under these circumstances Rebecca was a direct victim of Gateway's and Marine's tortious conduct.

We therefore conclude that the trial court abused its discretion in sustaining the demurrer to Rebecca's cross-complaint without leave to amend. Therefore, the judgment of the trial court dismissing Rebecca's cross-complaint is reversed. Similarly, the application for a writ of mandate to require the trial court to vacate its order sustaining the demurrer to Kately's fourth through seventh causes of action and to overrule Gateway's demurrer to those causes of action is granted. The application for writ of mandate is denied insofar as it relates to the demurrer of Gateway to Kately's eighth cause of action.

Andreen, Acting P. J., and Martin, J., concurred.

A petition for a rehearing was denied November 23, 1983, and respondents' petition for a hearing by the Supreme Court was denied February 2, 1984. Reynoso, J., was of the opinion that the petition should be granted.