[No. A059251. First Dist., Div. Three. Mar. 11, 1994.]

ANTHONY KWAN, Plaintiff and Respondent, v.
MERCEDES-BENZ OF NORTH AMERICA, INC., Defendant and
Appellant.

## COUNSEL

Thacher, Albrecht & Ratcliff, James E. Ratcliff, Jr., and Benjamin H. Ballard III for Defendant and Appellant.

Kemnitzer, Dickinson, Anderson, & Barron, Bryan Kemnitzer and Nancy Barron for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—Anthony Kwan sued Mercedes-Benz of North America, Inc. (MBNA) for violation of the refund-or-replace provision of the Song-Beverly Consumer Warranty Act (the Act) (Civ. Code, §§ 1790, 1793.2, subd. (d)(2)),[1] arising out of Kwan's purchase of a new Mercedes-Benz. Kwan received a jury award of $186,000. MBNA appeals, claiming the court erred in its instructions defining a "willful" violation of the Act for purposes of its civil penalty provision (§ 1794, subd. (c)) and in allowing the jury to award damages for Kwan's emotional distress. We reverse in part and remand for a limited new trial on damages.

### FACTS

Kwan bought a 1989 300E series Mercedes-Benz at European Motors, Ltd. (European Motors or the dealership) on October 30, 1989, for $46,370.24. The car had a four-year, fifty-thousand-mile warranty. Before the car was delivered to the dealership, MBNA's vehicle preparation center had repaired a dent in the door and replaced a damaged radio and surrounding wood console. Before sale, the dealership again replaced the radio, which was malfunctioning.

Kwan first brought the car back to European Motors for repair on November 20, complaining of a gurgling sound coming from the front of the car and a tendency for the windshield to mist up when the car was started. The

---

[1]All further statutory references are to the Civil Code unless otherwise specified.

gurgling (a sound like that produced by pouring water from one glass to another) was a problem other owners of the same model had also reported. At that time, the dealership did not have a specific cure for the problem, but they bled the cooling system in order to eliminate any trapped air bubbles. The windshield misting was deemed normal, and no repair was made.

From December 1989 through May 1990, Kwan took the car to the dealership five times for repair under warranty. He complained on December 11 of the gurgling sound, the windshield misting, a missing seat-control button, and difficulty closing the right rear door; on March 2 of the gurgling, loose molding on a door pillar, difficulty starting the car when cold, and a loose brake pedal; on March 22 of the gurgling (for which on this occasion the dealership ordered a corrective kit that was now available from MBNA), stalling when the car was put into gear while cold,[2] continuing difficulty with the hard-to-close door, a gap in the pillar molding that was previously repaired, a harsh shift from first to second gears, and an "SRS" (airbag) light coming on; on April 23 of the check-engine light staying on (for which the mechanic performed a diagnostic test and adjusted the engine), an inoperable electrical seat adjustment, a burnt-out taillight, and the gurgling sound (for which the mechanic installed the kit from MBNA); and on May 14 of the gurgling still occurring intermittently (for which the mechanic drilled clear a passage in the system), engine oil leakage, continuing difficulty closing the right rear door, noise from the brake pedal, and a rough running engine.

On May 17, the car was damaged during a dealership road test. On May 24, David Jung, Kwan's lawyer, wrote to MBNA on Kwan's behalf demanding "replacement of the vehicle or rescission of the transaction and a complete refund of [Kwan's] funds." Reinhold Zimmerman, MBNA's San Francisco zone manager for service and parts, who had authority to offer refund or replacement, offered to have the gurgling sound repaired. Assured by MBNA and European Motors they could repair the car, Jung advised Kwan to allow additional repair efforts.

When Kwan picked the car up from the body shop, he told Jung it was still gurgling. Jung wrote Zimmerman on June 19, informing him the gurgling was still present and Kwan was dissatisfied with the body work done to repair damage from the May 17 accident. Jung enclosed a notice of rescission of contract with this letter. Zimmerman arranged to drive the car, heard no gurgling, and thought the body repairs and paint match looked "excellent." He told Jung this by letter of July 9.

Kwan brought the car to European Motors on July 5, complaining of intermittent cooling system gurgling and of a water leak in the right front

---

[2]Kwan testified the car stalled not only when it was put into gear, but also when making turns.

door. The dealership ordered a new door seal but made no further repair to the cooling system. Kwan brought the car in again on August 2 because the engine was running rough and the check-engine light was on, and again on August 15 for installation of part of the door seal that had arrived late.

Jung wrote Zimmerman on August 24 enclosing a tape recording of the gurgling noise to show it was still occurring. Jung testified he also told Zimmerman in a telephone conversation on August 27 about the continuing check-engine light problem, but Zimmerman testified they never discussed any problem other than the gurgling. Kwan, through Jung, accepted Zimmerman's offer to put a new heater core in the car to eliminate the gurgling. The car was brought in for installation of the new heater core on September 5. At that time, the dealership also attempted again to fix the check-engine light, which had come on again, and replaced a sending unit that was causing a fuel gauge malfunction.

After the September 1990 repairs, Kwan continued to hear the gurgling sound, the check-engine light came on again, the idle continued rough, and the windshield fogged up. Richard Greenspan, an expert mechanic who inspected and drove the car in November 1990, found the check-engine light was on and heard the gurgling noise when the car was started cold. In his notes, he described the sound as "like water sloshing in a pail." Greenspan also drove the car for a longer period in 1991; at that time, he noticed intermittent rough running (shaking and misfire), a malfunctioning alarm, a deeply-scratched sunroof, oil leaking from an air conditioning connection, and windshield fogging even on a hot day. Greenspan opined the check-engine light was a very serious problem even if the car is running fine, because the owner cannot know whether something serious had gone wrong; "as an owner you wouldn't want to keep driving the car with that light on . . . ."

Kwan and his family stopped using the car sometime after September 1990, believing it unsafe to drive. Kwan retained his present attorney, who wrote to Zimmerman on December 6, again demanding a refund or replacement for the car. Zimmerman forwarded that letter to MBNA's legal department, but took no further action before this lawsuit was filed on December 12, 1990.

Zimmerman testified that although he had the authority to offer refund or replacement, MBNA had given him no written guidelines as to when a reasonable number of attempts had been made to repair a vehicle. Although he drove the car at the dealership and had access there to the service file, he did not examine the file to determine how many times the car had been in for

repair; he believed the only problems were with the gurgling and the body work. The check-engine light problem was never brought to his attention. Dieter Stenzhorn, an MBNA expert mechanic who assisted the dealership with the repairs on September 5, did not tell Zimmerman of the other problems Kwan had reported on that date.

Zimmerman never had any of his subordinates investigate or calculate how many times the car had been to the dealership for repair or how many days it had spent in the shop either in general or for specific problems; he knew, however, the car had been in four times for the gurgling problem at the time he became involved.

Zimmerman's general practice when he received a demand letter from an attorney was to contact the attorney and see if he could negotiate a repair of the automobile instead of a replacement or refund. If such negotiations failed, he would consult the legal department and technical staff before making a final decision about buying back or replacing the car. In the course of his interaction with Jung, he never had to make a decision about rescission because ". . . Mr. Jung was, his interest was like mine, to make sure that we can repair the automobile." After his last conversation with Jung, in August 1990, he did not know of any unresolved problems with the car, and he expected Jung would contact him if there were any further complaints.

The jury awarded Kwan $62,000 in actual damages (to be paid in exchange for return of the vehicle) and $124,000 as a penalty for willful violation. Kwan was also awarded more than $106,000 in attorney fees.

DISCUSSION

I. *Instruction on "Willful" Violation of the Act*

Section 1794 sets out the damages available to a buyer for a seller or manufacturer's failure to comply with an obligation under the Act or under a consumer product warranty. Subdivision (c) (hereafter section 1794(c)) provides for a civil penalty of up to twice actual damages "[i]f the buyer establishes that the failure to comply was willful . . . ."[3] MBNA contends, and we agree, the trial court here prejudicially erred in its instructions on what constitutes a "willful" violation.

The court gave the following instruction defining "willful," drawn from Penal Code section 7, subdivision 1: "The word willful when applied to the

---

[3]Subdivision (e) of section 1794—which provides an alternative basis for a civil penalty where the manufacturer has violated the Act's refund-or-replace provision, has been notified by the buyer after a presumptively reasonable number of repair attempts, and has not maintained a qualified third party dispute resolution process—is not at issue here. No instructions were given on this basis for assessing a penalty.

intent with which an act is done or omitted merely implies simply a purpose or willingness to commit the act or to make the omission in question. [¶] The word does not require in its meaning any intent to violate the law or to injure or damage another or to acquire any advantage."

MBNA proposed two instructions on willfulness, neither of which was given: the first stated a defendant could not be subject to the civil penalty if it made a "good faith, reasonable determination that the defect was not a breach of warranty by the defendant"; the second that "willful" meant MBNA "knew that it had an obligation to agree to the rescission but intentionally refused to do so."

The trial court gave the Penal Code instruction in reliance on *Ibrahim* v. *Ford Motor Co.* (1989) 214 Cal.App.3d 878 [263 Cal.Rptr. 64], a case construing various portions of the Act, including the civil penalty provision. After concluding the judgment for the defendant had to be reversed because of unrelated instructional error, the *Ibrahim* court turned to the civil penalty issue. It criticized the definitional instruction given, which referred to the act being "blameworthy" and done "in reckless disregard" of the consumer's rights, as injecting an improper moral component into the willfulness question. (*Id.* at pp. 893-894.)

The *Ibrahim* court continued with a paragraph relied upon by both sides here: "The instructions should have told the jury that a civil penalty could be awarded to plaintiff if the jury determined that Ford knew of its obligations but intentionally declined to fulfill them. Instead, the jury's attention was confused with language which virtually compelled a wholly extraneous moral assessment of Ford's conduct. The trial court would have been better advised to have used the instructions proposed by plaintiff." (*Ibrahim* v. *Ford Motor Co., supra,* 214 Cal.App.3d at p. 894, fn. omitted.) Those instructions, set out in a footnote following the above paragraph, are substantially the same as were given here.

*Ibrahim* does not compel a conclusion the general definition of "willful" taken from the Penal Code is adequate or appropriate in all cases arising under section 1794(c). The relevant *holding* of *Ibrahim*, with which we agree, is that moral blameworthiness is not a necessary element of willful conduct under section 1794(c). The court's further remark, that the trial court would have been "better advised" to use the Penal Code definition, implies at most an approval of that definition as appropriate to the facts of that case. Nothing in the appellate court's recitation of the facts (*Ibrahim* v. *Ford Motor Co., supra,* 214 Cal.App.3d at pp. 882-884) suggests Ford made a reasonable, good faith determination it was not obliged to refund the

plaintiff's purchase price, or that Ford did not know and was not on notice of its obligations under the Act. The appellate court's statement a civil penalty was appropriate if Ford "knew" of its obligations indicates the court would have deemed an instruction to that effect necessary had the facts of the case supported it. (*Id.* at p. 894.)

When we turn to other decisions involving the meaning of willfulness, we find the concept is not one easily captured in a single, uniformly applicable formula. Although Penal Code section 7, subdivision 1 states willfulness is "simply a purpose or willingness to commit the act, or make the omission referred to," there is no shortage of cases construing the term, in penal statutes, as conveying more than mere volition. Willfulness has been construed, for example, to contain an element of knowledge about or notice of the truth or falsity of representations. (See, e.g., *People* v. *Von Tiedeman* (1898) 120 Cal. 128, 135 [52 P. 155] [to prove defendant committed perjury by " 'willfully' " making an unqualified statement he did not know to be true, statement must have been made "with the consciousness that he did not know that it was true, and with the intent that it should be received as a statement of what was true in fact."]; *Murrill* v. *State Board of Accountancy* (1950) 97 Cal.App.2d 709, 712-714 [218 P.2d 569] [plea of "willful" failure to supply information for federal income tax computation shows omission was not negligent, inadvertent or an honest mistake, but rather was dishonest, deceitful or fraudulent].)

Similarly, where the crime involves harm or the risk of harm to another, willfulness has been interpreted to imply knowledge of harm or conscious disregard of safety. (See, e.g., *People* v. *Odom* (1937) 19 Cal.App.2d 641, 645-646 [66 P.2d 206] [in charging violation of hit-and-run statute, "wilfully" implies knowledge driving had caused the injury or death of a person]; *People* v. *McNutt* (1940) 40 Cal.App.2d Supp. 835, 837-838 [105 P.2d 657] [in reckless driving statute, "wilful" refers to intentional disregard of safety, not merely to intentional performance of the unsafe act].)

Civil cases show much the same line of analysis. In *Williams* v. *Carr* (1968) 68 Cal.2d 579, 583-584 [68 Cal.Rptr. 305, 440 P.2d 505], the court explained that "willful misconduct," in an automobile guest statute, "implies the intentional doing of something either with knowledge, express or implied, that serious injury is a probable, as distinguished from a possible, result, or the intentional doing of an act with a wanton and reckless disregard of its consequences. [Citations.]" In *J. C. Penney Casualty Ins. Co.* v. *M. K.* (1991) 52 Cal.3d 1009, 1020-1021 [278 Cal.Rptr. 64, 804 P.2d 689], interpreting Insurance Code section 533 (insurer not liable for "wilful act" of insured), the court was at pains to make clear willfulness implied more than

the " 'intentional doing' " of a negligent act. All "acts" being voluntary by definition, "willful act" must mean something more than that the act was done voluntarily. (52 Cal.3d at p. 1020, fn. 11.)

Even in cases relied upon by plaintiff, the concept of willfulness is more nuanced than he admits. Thus, the court in *Goodhew* v. *Industrial Acc. Com.* (1958) 157 Cal.App.2d 252 [320 P.2d 515], while holding a civil penalty for "willful" failure to obtain workers' compensation insurance was proper without proof of "a guilty intent on the part of the employer to suffer and incur the penalties provided by law" (*id.* at p. 256), also explained the penalty was intended to apply when the failure was "conscious, intentional and deliberate," and concluded a penalty was to be awarded in the case before it because the evidence showed ". . . the employer intentionally and deliberately failed to secure coverage as to its corporate officers although it had knowledge that such coverage was required by law . . . ." (*Id.* at p. 257.) Similarly, *Davis* v. *Morris* (1940) 37 Cal.App.2d 269, 274 [99 P.2d 345], involving a statutory penalty for "wilful" failure to pay wages when due, states the penalty requires no "deliberate evil purpose to defraud workmen of wages which the employer knows to be due"; but, at the same time, the appellate court noted it was for the trial court to decide "whether the defendants were in good faith in claiming that wages were not due because the plaintiff contributed his services as a member of the partnership." (*Ibid.*)

The slipperiness of the term "willfulness" is illustrated by a simple definition quoted in several cases, including *Davis* v. *Morris, supra,* 37 Cal.App.2d at page 274 and *Ibrahim* v. *Ford Motor Co., supra,* 214 Cal.App.3d at page 894. Willfulness, it is said, " 'amounts to nothing more than this: That the person knows what he is doing, intends to do what he is doing, and is a free agent.' " While this adage has a definitive ring to it, it seems to beg the crucial question: to "know[] what he is doing" and "intend[] to do what he is doing," must a person know, or at least have notice of, the circumstantial or consequential facts that bring the action within the strictures of the law? Did the hit-and-run driver in *People* v. *Odom, supra,* 19 Cal.App.2d 641, "know[] what he [was] doing" if he drove on without knowing he had hit the pedestrian? Did the accused perjurer in *People* v. *Von Tiedeman, supra,* 120 Cal. 128, "intend[] to do what he [was] doing" if he sincerely thought his statement was within his knowledge? Did the accountant in *Murrill* v. *State Board of Accountancy, supra,* 97 Cal.App.2d 709, "know[] what he [was] doing" if he reasonably believed the tax information he failed to supply was not required?

These are questions that cannot be answered by application of a universal formula outside the context of the particular statute being considered. As

noted in *Goodhew* v. *Industrial Acc. Com.*, *supra*, 157 Cal.App.2d at page 256, "[t]he word 'wilful' is used in different statutes with various shades of meaning."

■ Turning then to the Act itself, we are guided by three considerations in determining the intended scope of section 1794(c). First, the Act is manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action. (*Kim* v. *Servosnax, Inc.* (1992) 10 Cal.App.4th 1346, 1356 [13 Cal.Rptr.2d 422].) In particular, the penalty provided in section 1794(c) is important as a deterrent to deliberate violations. Without such a provision, a seller or manufacturer who knew the consumer was entitled to a refund or replacement might nevertheless be tempted to refuse compliance in the hope the consumer would not persist, secure in the knowledge its liability was limited to refund or replacement. Any interpretation that would significantly vitiate the incentive to comply should be avoided.

Second, the Act imposes a variety of obligations and by its terms establishes a two-tier system of damages for willful and nonwillful violations. A manufacturer, distributor or retailer of consumer goods may violate the Act by attempting to limit or disclaim an implied warranty while giving an express warranty (§ 1793); by failing to disclose warranty terms or to include certain information on repair invoices and work orders (§ 1793.1); by failing to maintain or contract for sufficient service and repair facilities (§ 1793.2, subd. (a)(1)); by failing to commence repairs within a reasonable time or complete them within 30 days (§ 1793.2, subd. (b)); by failing to replace the goods or reimburse the buyer if the goods cannot be conformed to warranty after a reasonable number of attempts (§ 1793.2, subd. (d)); and by various other acts and omissions (e.g., §§ 1793.3, subd. (a), 1795.8). Under section 1794, subdivision (a), the buyer may obtain specified actual damages for any such violation or for breach of any implied or express warranty. The civil penalty, however, is available under section 1794(c) only for some of these violations, the "willful" ones. We should interpret willfulness in light of the particular statutory obligation allegedly violated and should eschew any interpretation that would render meaningless or inoperative the Act's distinction between willful and nonwillful violations.

Finally, the penalty under section 1794(c), like other civil penalties, is imposed as punishment or deterrence of the defendant, rather than to compensate the plaintiff. In this, it is akin to punitive damages. (*Troensegaard* v. *Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 226-228 [220 Cal.Rptr. 712] [improper to impose punitive damages as well as § 1794 civil penalty].) Neither punishment nor deterrence is ordinarily called for if the

defendant's actions proceeded from an honest mistake or a sincere and reasonable difference of factual evaluation. As our Supreme Court recently observed, ". . . courts refuse to impose civil penalties against a party who acted with a good faith and reasonable belief in the legality of his or her actions. (*Whaler's Village Club* v. *California Coastal Com.* (1985) 173 Cal.App.3d 240, 263 []; *No Oil, Inc.* v. *Occidental Petroleum Corp.* (1975) 50 Cal.App.3d 8, 30 [].)" (*Lusardi Construction Co.* v. *Aubry* (1992) 1 Cal.4th 976, 996-997 [4 Cal.Rptr.2d 837, 824 P.2d 643]; see also *Crofoot* v. *Weger* (1952) 109 Cal.App.2d 839, 841-842 [241 P.2d 1017] [for purposes of relief from forfeiture under § 3275, failure to make a required payment, although intentional, might not be "willful" where obligor reasonably disputed whether the payment was in fact owed].)

The statutory obligation Kwan claimed MBNA willfully violated was to replace the vehicle or refund the purchase price. (§ 1793.2, subd. (d)(2).)[4] The considerations discussed above lead us to conclude such a violation is not willful if the defendant's failure to replace or refund was the result of a good faith and reasonable belief the facts imposing the statutory obligation were not present. This might be the case, for example, if the manufacturer reasonably believed the product *did* conform to the warranty, or a reasonable number of repair attempts had not been made, or the buyer desired further repair rather than replacement or refund.

Our interpretation of section 1794(c) is consistent with the general policy against imposing forfeitures or penalties against parties for their good faith, reasonable actions. Unlike a standard requiring the plaintiff to prove the defendant *actually knew* of its obligation to refund or replace, which would allow manufacturers to escape the penalty by deliberately remaining ignorant of the facts, the interpretation we espouse will not vitiate the intended deterrent effect of the penalty. And unlike a simple equation of willfulness with volition, which would render "willful" virtually all cases of refusal to replace or refund, our interpretation preserves the Act's distinction between willful and nonwillful violations.

Kwan maintains MBNA was in any event not entitled to an instruction presenting the issue of a good faith factual dispute or mistake, because the evidence showed MBNA failed to investigate the repair history of the car despite the availability to it of that information. We agree a manufacturer who refused a refund or replacement on the ground a reasonable number of repair attempts had not been made, without making any effort to gather the available information on repair history, might well be deemed to have acted

---

[4]Although the complaint also alleged a willful failure to repair, the jury was not instructed on that theory.

willfully. A decision made without the use of reasonably available information germane to that decision is not a reasonable, good faith decision.

The defense evidence here, however, went not to the number of repair attempts, but to whether the car had in fact been repaired and whether Kwan was in fact seeking rescission. Zimmerman testified Jung and Kwan never told him there were extant, uncorrected problems with the car other than the gurgling sound and Kwan's dissatisfaction with the body work. When Zimmerman drove the car in July 1990, he observed what he thought was excellent body work and heard no gurgling. After being told the gurgling persisted in August, Zimmerman arranged for a new-model heater core to be put in; after that was done, he did not hear anything more from Jung or Kwan until the final rescission letter in December. Throughout that period, Jung, on Kwan's behalf, had repeatedly agreed to allow continued repair efforts rather than insisting on replacement or refund. In addition, a technical specialist from MBNA testified the gurgling sound, caused by an air pocket formed in the heater overnight, lasted only a few seconds and caused no damage to anything. MBNA technicians were unaware of any instances in which replacing the original heater core with the new model failed to eliminate the gurgling. This evidence was sufficient to present the question whether Zimmerman, in the summer and autumn of 1990, reasonably and in good faith believed no refund or replacement of the car was called for, either because Kwan wished to keep the car while having MBNA and European Motors repair it further, or because all nonconformities had in fact been repaired.[5]

Finally, Kwan emphasizes MBNA had no written policy on implementation of the Act's provisions and argues this lack is circumstantial evidence of a corporate state of mind that intended to violate the Act. Zimmerman testified, however, to his practice in dealing with demands for refund or replacement. Whether the lack of a written policy demonstrates MBNA's lack of good faith is a question to be answered by a properly instructed jury, not by this court.

MBNA was entitled to an instruction informing the jury its failure to refund or replace was not willful if it reasonably and in good faith believed the facts did not call for refund or replacement.[6] Such an instruction would have given the jury legal guidance on the principal issue before it in

---

[5]A defect or problem constitutes a nonconformity to warranty only if it substantially impairs the use, value or safety of the motor vehicle. (§ 1793.22, subd. (e)(1).)

[6]As already noted, MBNA did submit a proposed instruction setting out the "good faith, reasonable determination" standard. Although that proposed instruction also contained language on other subjects, modification of the instruction to eliminate the other language would have been a simple matter. The record, in any event, indicates the court gave the Penal Code

determining whether a civil penalty could be awarded. The Penal Code definition of willful, by itself, gave inadequate guidance under the circumstances of this case.

The absence of an instruction outlining the critical issue regarding willfulness resulted in a miscarriage of justice requiring reversal of the civil penalty award. (Cal. Const., art. VI, § 13.) Although, as Kwan emphasizes, the reasonableness of MBNA's conduct was discussed by attorneys for both sides in argument to the jury, and MBNA's attorney even argued his client acted in "good faith," the degree of conflict in the evidence and the complete lack of guidance on the issue provided by the instruction given persuade us a more favorable result was reasonably probable had the jury been instructed that a reasonable, good faith decision did not constitute a willful violation. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 770-771 [206 Cal.Rptr. 354, 686 P.2d 1158].)

## II. *Damages for Emotional Distress*

Over defense objection, the court allowed evidence of, and instructed the jury it could award damages for, Kwan's "emotional distress." Kwan testified the repeated efforts to get his car repaired, and the operational problems he considered unsafe, made him "frustrat[ed] and mad," "sad," "nervous," and "worr[ied] about the safety for the family." The jury awarded emotional distress damages in an amount not stated in the special verdict, but which both parties agree was about $10,000. We conclude such damages are not authorized under the Act.

The Legislature has made it clear the compensatory damages available to a buyer under the Act are limited to the same categories, and measured in the same manner, as those normally available to a buyer for a seller's breach of a contract for sale of goods. Under section 1794, subdivision (b), the buyer's remedies under the Act include, in addition to the refund-or-replace remedy of section 1793.2, subdivision (d), damages as follows: "(1) Where the buyer has rightfully rejected or justifiably revoked acceptance of the goods or has exercised any right to cancel the sale, Sections 2711, 2712, and 2713 of the Commercial Code shall apply. [¶] (2) Where the buyer has accepted the goods, Sections 2714 and 2715 of the [California Uniform] Commercial Code shall apply, and the measure of damages shall include the cost of repairs necessary to make the goods conform." (§ 1794, subd. (b).)

California Uniform Commercial Code sections 2711 to 2715, in turn, set out the damages for breach of a seller's obligations. Sections 2712, 2713 and

---

instruction alone because it believed that instruction sufficient to define the term for the jury, not because of any difficulty modifying defendant's proposed instruction.

2714 all allow recovery of incidental or consequential damages as defined in section 2715. According to section 2715, subdivision (2)(b), consequential damages resulting from a seller's breach include "[i]njury to person or property proximately resulting from any breach of warranty."

Neither the parties' nor our own research has disclosed any California case deciding whether, under these provisions of the California Uniform Commercial Code, emotional distress damages are recoverable for a violation of the Act. The clear mandate of section 1794, however, is that the compensatory damages recoverable for breach of the Act are those available to a buyer for a seller's breach of a sales contract. As will be seen, such damages do not in most cases include recompense for mental suffering independent of physical injury.

■ The general rule in California is that damages for mental suffering may not be recovered in an action for breach of an ordinary commercial contract. (*Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877, 887-888 [208 Cal.Rptr. 394]; *Wynn* v. *Monterey Club* (1980) 111 Cal.App.3d 789, 799 [168 Cal.Rptr. 878]; *Sawyer* v. *Bank of America* (1978) 83 Cal.App.3d 135, 139 [145 Cal.Rptr. 623]; *O'Neil* v. *Spillane* (1975) 45 Cal.App.3d 147, 159 [119 Cal.Rptr. 245].)

California courts have recognized, on the other hand, the existence of extraordinary contracts, ones "which so affect the vital concerns of the individual that severe mental distress is a foreseeable result of breach. For many years, our courts have recognized that damages for mental distress may be recovered for breach of a contract of this nature. [Citations.]" (*Allen* v. *Jones* (1980) 104 Cal.App.3d 207, 211 [163 Cal.Rptr. 445].) Stated another way, the exceptional contracts are those whose terms " 'relate to matters which concern directly the comfort, happiness, or personal welfare of one of the parties, or the subject matter of which is such as directly to affect or move the affection, self-esteem, or tender feelings of that party . . . .' " (*Wynn* v. *Monterey Club, supra,* 111 Cal.App.3d at p. 800, quoting *Westervelt* v. *McCullough* (1924) 68 Cal.App. 198, 208-209 [228 P. 734].)

The rule against emotional distress damages for breach of contract has been applied in California to bar such damages, for example, for breach of a choral singer's employment contract (*Westwater* v. *Grace Church* (1903) 140 Cal. 339, 341-343 [73 P. 1055]), in an action for rescission of a real estate gift on the ground of undue influence (*O'Neil* v. *Spillane, supra,* 45 Cal.App.3d at pp. 159-160), and for a bank's breach of its contractual obligation to buy automobile insurance for a borrower (*Sawyer* v. *Bank of America, supra,* 83 Cal.App.3d at pp. 138-139).

The exceptional contracts for whose breach distress damages have been allowed include the agreement of two gambling clubs with a husband to exclude his wife from the clubs and not to cash her checks (*Wynn* v. *Monterey Club, supra,* 111 Cal.App.3d at pp. 799-801), a mortician's contract to preserve a dead body (*Chelini* v. *Nieri* (1948) 32 Cal.2d 480, 481-482 [196 P.2d 915]) and to ship cremated remains (*Allen* v. *Jones, supra,* 104 Cal.App.3d at pp. 210-213), a cemetery's agreement to keep a burial service private and protect the gravesite from vandalism (*Ross* v. *Forest Lawn Memorial Park* (1984) 153 Cal.App.3d 988, 992-996 [203 Cal.Rptr. 468, 42 A.L.R.4th 1049]), and a bailment for jewelry of great sentimental value where that value was made known to the bailee (*Windeler* v. *Scheers Jewelers* (1970) 8 Cal.App.3d 844, 851-852 [88 Cal.Rptr. 39]).

In this area, California law appears substantially in accord with the Restatement, which provides: "Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." (Rest.2d Contracts, § 353; cited and followed in *Quigley* v. *Pet, Inc., supra,* 162 Cal.App.3d at p. 888.)

Cases from other jurisdictions, following the Restatement or a similar formulation of the rule, have held distress damages barred in actions for breach of a warranty on sale of a motorboat (*Wellcraft Marine* v. *Zarzour* (Ala. 1990) 577 So.2d 414, 418-419 ["We decline to hold . . . that the sale of a boat is a contract so related to matters of mental concern or solicitude as to bring it within" the exception]), for breach of an attorney's agreement to examine title to real property (*Maere* v. *Churchill* (1983) 116 Ill.App.3d [72 Ill.Dec. 441, 452 N.E.2d 694, 697-698]), for a plumber's failure to correctly diagnose a sewage blockage problem (*Gallagher* v. *Upper Darby Tp.* (1988) 114 Pa.Commw. 463 [539 A.2d 463, 467]), and for breach of an agreement settling a defamation suit (*Dean* v. *Dean* (5th Cir. 1987) 821 F.2d 279, 282-283).

Like the California cases, decisions from other jurisdictions upholding distress awards tend to involve contracts "very personal in nature" (Woodward v. Naylor Motor Sales (Mich.Dist.Ct. 1974) 14 U.C.C.Rep.Serv. (Callaghan) 1269, 1275), in which emotional concerns are closely linked to "the essence of the contract" (*Dean* v. *Dean, supra,* 821 F.2d at p. 283). Thus, damages for mental suffering have been upheld for breach of a contract not to invade a prisoner's privacy (*Huskey* v. *National Broadcasting Co., Inc.* (N.D.Ill. 1986) 632 F.Supp. 1282, 1292-1293) and a breach of warranty on sale of a "Permaseal II" casket sold as leakproof (*Hirst* v. *Elgin Metal Casket Co.* (D.Mont. 1977) 438 F.Supp. 906, 907-908).

In our view, a contract for sale of an automobile is not essentially tied to the buyer's mental or emotional well-being. Personal as the choice of a car may be, the central reason for buying one is usually transportation. In the words of the Restatement, a breach of such a contract is not "particularly likely" to result in "serious" emotional distress. (Rest.2d Contracts, § 353.) The purchase of an automobile ordinarily does not "so affect the vital concerns of the individual that severe mental distress is a foreseeable result of breach." (*Allen* v. *Jones, supra,* 104 Cal.App.3d at p. 211.)

In spite of America's much-discussed "love affair with the automobile," disruption of an owner's relationship with his or her car is not, in the normal case, comparable to the loss or mistreatment of a family member's remains (e.g., *Allen* v. *Jones, supra,* 104 Cal.App.3d 207), an invasion of one's privacy (*Huskey* v. *National Broadcasting Co., Inc., supra,* 632 F.Supp. 1282), or the loss of one's spouse to a gambling addiction (*Wynn* v. *Monterey Club, supra,* 111 Cal.App.3d 789). In the latter situations, the contract exists primarily to further or protect emotional interests; the direct and foreseeable injuries resulting from a breach are also primarily emotional. In contrast, the undeniable aggravation, irritation and anxiety that may result from breach of an automobile warranty are secondary effects deriving from the decreased usefulness of the car and the frequently frustrating process of having an automobile repaired. While purchase of an automobile may sometimes lead to severe emotional distress, such a result is not ordinarily foreseeable from the nature of the contract.

MBNA and Kwan both cite cases from other jurisdictions applying the Uniform Commercial Code to the question of distress damages for breach of a contract for sale of an automobile. Kwan appears correct there is no uniform rule nor even a clear majority view. In *Woodward* v. *Naylor Motor Sales, supra,* 14 U.C.C.Rep.Serv. at pages 1274-1275, a Michigan court looked to the common law of contract to determine what is included in "consequential damages" under Uniform Commercial Code sections 2-714 and 2-715. The court concluded: "The two distinguishing characteristics of such cases where damages for mental distress are allowed are that they are very personal in nature and that they are almost always service contracts. The present case before the court is a rather typical commercial transaction for the sale of goods. . . . [T]his court concludes that no reasonable jury could compare the situation in the case at bar with any of the case findings on the subject and find that this sale of a car was of such a personal nature so as to allow damages for mental distress." (Accord, *Wise* v. *General Motors Corp.* (W.D.Va. 1984) 588 F.Supp. 1207, 1210-1211 [following *Naylor* and applying Rest.2d Contracts, § 353]; see also *Dye* v. *M.L.M., Ltd.* (Pa.C.P. 1986) 2 U.C.C.Rep.Serv.2d 523, 526 [plaintiff's "long standing

dream to own a sports car" did not support damages for "disappointment, dissatisfaction and outrage" over defendants' failure to repair his new Fiat].)

The Alabama Supreme Court reached the opposite conclusion in *Volkswagen of America, Inc.* v. *Dillard* (Ala. 1991) 579 So.2d 1301, upholding a jury award for mental anguish resulting from breach of a new car warranty. (*Id.* at pp. 1302, 1307.) The *Dillard* court, however, relied in significant part on language in the Alabama version of Uniform Commercial Code section 2-714 that is not in the official Uniform Commercial Code text and has no counterpart in California's version, California Uniform Commercial Code section 2714, subdivision (2). The Alabama statute provided that damages for personal injury resulting from a breach of warranty "include those damages ordinarily allowable in such actions [i.e., personal injury actions] at law." (*Dillard, supra,* 579 So.2d at p. 1305, italics omitted.) The court based its holding on this provision, together with Alabama precedent allowing recovery for mental anguish without accompanying physical injury. (*Id.* at pp. 1306-1307.) The court's reliance on idiosyncratic statutory language, as well as its failure to explain why sale of an automobile should be regarded as so closely coupled with "matters of mental concern or solicitude" as to allow distress damages (*id.* at p. 1304, internal quotation marks and italics omitted), makes *Dillard* less than persuasive precedent. (See also *McGrady* v. *Chrysler Motors Corp.* (1977) 46 Ill.App.3d 136 [4 Ill.Dec. 705, 360 N.E.2d 818, 821-822] [upholding damages for "inconvenience, aggravation and loss of use" in action for breach of implied warranty, without discussing general rule barring distress damages for breach of commercial contracts].)

Kwan argues his case was pleaded and tried as a tort, namely "willful violation of statutes . . . intended to protect consumers." He maintains he should therefore be entitled to all normal tort remedies available under section 3333, assertedly including damages for emotional distress. We reject this interpretation of damages available for violations of the Act as inconsistent with the Legislature's expressly stated intent. It is true Kwan alleged and proved to the jury's apparent satisfaction not merely a breach of contract, but a violation of the replace-or-refund obligation imposed by the Act.[7] This does not, however, entitle him to damages beyond those provided for in the Act.

---

[7]Kwan oversimplifies the record when he states his action was not on the contract or for "common law breach of warranty." He alleged a breach of warranty ("and hence violation of the [federal] Magnuson-Moss Warranty Act"). The jury, moreover, was instructed that to reach a verdict for plaintiff it need only find "One, that plaintiff was a buyer of a new motor vehicle . . . ; two, that defendant Mercedes provided or adopted an express written warranty which covered the nonconformities that existed in the vehicle; *three, that defendant Mercedes* through its authorized dealer, European Motors, *breached the express warranty* after a reasonable number of repair attempts; *four, that the breach was a legal cause of damage to*

Section 1794, subdivision (b) clearly equates the compensatory damages for a failure to replace or refund with those available to a buyer for a seller's breach of a contract for sale of goods (in addition, of course, to replacement or refund). We are not free to ignore this unambiguous indication of intent and supplement the statutory remedies with additional ones drawn from the field of torts. (See *Gomez* v. *Volkswagen of America, Inc.* (1985) 169 Cal.App.3d 921, 928-929 [215 Cal.Rptr. 507] [no tort remedy for violation of covenant of good faith and fair dealing in automobile warranty; Legislature has provided adequate remedies in § 1794].)

Neither of the cases Kwan relies on for his claim of a tort remedy (*Pintor* v. *Ong* (1989) 211 Cal.App.3d 837 [259 Cal.Rptr. 577]; *Young* v. *Bank of America* (1983) 141 Cal.App.3d 108 [190 Cal.Rptr. 122]) is on point, as neither concerns statutory language comparable to section 1794, subdivision (b). Nor are sections 1790.3 (the Act's guarantee of rights to consumers prevails over any conflicting provisions of the California Uniform Commercial Code) and 1790.4 (remedies of the Act are cumulative to those "otherwise available") relevant. Section 1794 does not conflict with the California Uniform Commercial Code provisions; it incorporates them. Kwan's proposed tort remedy, moreover, is not "otherwise available"; it derives, rather, from obligations imposed by the Act itself.[8]

Because we hold the Act does not authorize an award of damages for emotional distress, we need not consider MBNA's further claims the court erred in failing to instruct the jury such distress had to be "severe" and the evidence of severe distress was insufficient to support the verdict.

---

*plaintiff*; and five, the nature and extent of plaintiff's damages." (Italics added.) Our holding above, however, does not rest upon any distinction between breach of warranty and violation of other obligations imposed by the Act.

[8]This case presents no occasion to discuss or decide the availability of mental distress damages in an action based on strict product liability in tort where the use of the product has not caused physical injury to anyone; no cause of action for strict product liability in tort was pleaded or presented to the jury here. Nor do we express any opinion as to what, if any, damages for pain and suffering or distress might be available in an action for breach of warranty where the breach has led to a physical injury. (Cf. *Kately* v. *Wilkinson* (1983) 148 Cal.App.3d 576, 579-580 [195 Cal.Rptr. 902] [buyer-operator of defective speedboat could recover for emotional trauma caused when boat ran over and killed water skier].) Also not raised is the question whether and under what circumstances mental suffering caused by the negligence of another is compensable when the only other injury is economic. (See *Branch* v. *Homefed Bank* (1992) 6 Cal.App.4th 793, 799-801 [8 Cal.Rptr.2d 182].) Although Kwan alleged negligent repair, the jury was given no instructions on that theory of recovery, and it is not put forward as a ground for upholding the verdict. Finally, no claim has been made of a tort remedy for breach of the covenant of good faith and fair dealing or for bad faith denial of the contract.

CONCLUSION

The jury, by special verdict, found MBNA failed to conform Kwan's vehicle to its express warranty within a reasonable number of repair attempts. MBNA has made no claim of error in the evidence, instructions, or other aspects of the proceedings leading to this finding. We will therefore affirm the judgment as to liability. We cannot, however, simply modify the judgment by striking the emotional distress damages, because the verdict did not determine their amount; in addition, Kwan is entitled to a new trial to attempt to prove willful violation to a properly instructed jury. The question of damages may be retried without such confusion or uncertainty as would deny either party a fair trial. (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801 [197 P.2d 713].)

Kwan, having established liability and the right to refund or replacement of the vehicle under section 1793.2, subdivision (d)(2), remains the prevailing party. The order and amended order awarding costs and attorney fees will therefore be affirmed. (§ 1794, subd. (d).)

DISPOSITION

The judgment is affirmed insofar as it adjudges MBNA in violation of Civil Code section 1793.2, subdivision (d)(2). The judgment is reversed as to damages, and the cause is remanded for a new trial on the question of the damages, including any civil penalty, to which Kwan is entitled; the superior court is directed to enter judgment on the amount so determined. The order and amended order awarding costs and attorney fees are affirmed. Kwan is to pay MBNA's costs on appeal.

Merrill, Acting P. J., and Chin, J., concurred.