[No. B209979. Second Dist., Div. One. Feb. 4, 2010.]

PAUL LUKATHER, Plaintiff and Respondent, v.
GENERAL MOTORS, LLC, Defendant and Appellant.

1042

COUNSEL

Ruben & Sjolander and David N. Ruben for Defendant and Appellant.

Lawrence J. Hutchens for Plaintiff and Respondent.

OPINION

MALLANO, P. J.—After a bench trial, the court awarded plaintiff Paul Lukather damages, a civil penalty, prejudgment interest, and attorney fees and costs against defendant General Motors, LLC (GM),[1] under the Song-Beverly Consumer Warranty Act (Act), Civil Code section 1790 et seq., known as California's "lemon law." We affirm the judgment, rejecting GM's contentions that (1) the evidence is insufficient to support the findings that GM violated Civil Code section 1793.2, subdivision (d)(2) (section 1793.2(d)(2)), and that it did so willfully so as to incur a civil penalty; (2) the court erred in rejecting GM's mitigation of damages defense; and (3) the court abused its discretion in awarding prejudgment interest and attorney fees and costs.

## BACKGROUND

On April 25, 2005, Cadillac of Whittier (dealer) leased to Lukather a new 2005 Cadillac manufactured by GM. The lease was financed by GMAC. Within a month the Cadillac began to exhibit an intermittent but recurring malfunction in the electronic stability control system. Lukather first brought

---

[1] Pending this appeal, the original defendant, General Motors Corporation, entered into bankruptcy. The parties stipulated, and we ordered, that General Motors, LLC, was to be substituted in place and stead of General Motors Corporation as defendant and appellant.

the Cadillac in to the dealer to repair the malfunction on June 1, 2005, when the car had been driven only 854 miles. Between June 5, 2005, and January 30, 2007, Lukather brought the Cadillac to the dealer for service for the same malfunction on more than four occasions.

Lukather was driving the Cadillac on the freeway on February 12, 2007, when the brakes came on by themselves, making the car hard to drive. Lukather brought the Cadillac to the dealer, where it remained up to the time of trial in March 2008. At the time of trial, Lukather was still making lease and insurance payments on the Cadillac. Beginning in February 2007, GM paid for a rental car for Lukather, but it stopped making those payments on April 4, 2007. Lukather paid $21,290.46 for his rental car from April 5, 2007, to the time of trial.

GM's expert admitted at trial that the malfunction was unable to be repaired after reasonable attempts to do so. GM conceded at trial that the Cadillac qualified as a "lemon" under the Act. Thus, the principal contested issues at trial were whether GM violated section 1793.2(d)(2) by failing promptly to make restitution, and if so, whether the failure was willful so as to permit the assessment of a civil penalty.

The Act applies to leases as well as sales of consumer goods. (See Civ. Code, §§ 1795.4, 1791, subd. (a).) Section 1793.2(d)(2) provides in pertinent part: "If the manufacturer or its representative in this state is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle in accordance with subparagraph (A) or promptly make restitution to the buyer in accordance with subparagraph (B). However, the buyer shall be free to elect restitution in lieu of replacement, and in no event shall the buyer be required by the manufacturer to accept a replacement vehicle."

Subparagraph (B) of section 1793.2(d)(2) provides: "In the case of restitution, the manufacturer shall make restitution in an amount equal to the actual price paid or payable by the buyer, including any charges for transportation and manufacturer-installed options, but excluding nonmanufacturer items installed by a dealer or the buyer, and including any collateral charges such as sales tax, license fees, registration fees, and other official fees, plus any incidental damages to which the buyer is entitled under Section 1794, including, but not limited to, reasonable repair, towing, and rental car costs actually incurred by the buyer."

The key exhibit on the issue of whether GM complied with section 1793.2(d)(2) was a series of written "service request activity" logs that

memorialized the telephone contacts between Lukather and GM's call center. The logs reveal the following: On March 8, 2007, Lukather made a complaint to GM's call center, informing a customer relationship specialist (CRS) that he did not feel safe with the Cadillac any more. The CRS contacted the dealership, which confirmed the problem with the Cadillac and that the dealership and the engineer were still working to find out what was wrong with the car. The CRS noted that Lukather requested a "vehicle repurchase" and that he needed someone to help him. Lukather was advised that some research needed to be done and that his file would be "escalated" to a case manager. The log for March 8, 2007, contained the Cadillac's vehicle identification number and Lukather's contact information.

On March 9, 2007, a different CRS, Maggie Weber, contacted the service manager at the dealer, who told her that he thought the Cadillac was repaired. On March 12, 2007, Weber again contacted the service manager at the dealer, who told her that the Cadillac "tested out good over the weekend, and is going back to the customer today." Weber left a voice mail for Lukather on March 12, 2007, offering to cover one month's lease payment. On March 15, 2007, Lukather left a voice mail for Weber stating that he did not want the Cadillac back. Lukather also had a conversation with another CRS on March 15 in which he told her that he did not want the Cadillac back and that he was not satisfied with one month's payment. Lukather also spoke to Weber on March 15, telling her that he did not want the Cadillac back. Weber told Lukather that if the car is repaired, GM "may not be able to assist beyond that."

On March 20, 2007, Lukather again spoke with Weber, telling her that he did not want to accept the Cadillac back as he had safety concerns. Weber told Lukather that she was "escalating" his case to a person who specializes in making such decisions. Weber then left a voice mail message for Paul Wasco, GM's district service manager, informing him that Lukather did not want the Cadillac back and was "seeking alternatives."

Wasco left a voice mail message for Weber on March 22, 2007, admitting that the Cadillac "does basically qualify for lemon law," and asking whether Lukather wanted to be "released from the vehicle, or into a lease to another vehicle." Wasco was aware that Lukather was an elderly gentleman and said "let's see what we can do to get him taken care of." On March 23, Weber called Lukather and asked him whether he wanted "out of lease, or into another vehicle." Lukather told her that he did not want his lease payments to go up. He also asked Weber whether he should make the Cadillac lease payment due on March 25. Weber told him that to avoid credit issues, he should make the payment and that "this will probably not be completed by then." On March 23, Weber left a message for Wasco that Lukather "would

like to get into the lease of a used vehicle, does not want his payments to increase." Weber also asked Wasco what he wanted her to do at that point. Wasco returned Weber's call and told her that he will speak directly with Lukather and will work with the dealer "as far as payments and lease."

On March 26, 2007, Lukather told Weber that "he thinks he wants his lease money back." Weber told Lukather that Wasco should be contacting him about that later in the week. Wasco did not contact Lukather by April 2, 2007, when Lukather called Weber. Lukather left a voice mail complaining that the matter was dragging on, he had not heard from Wasco, he was still paying on the lease for the Cadillac, and he had been patient enough. Weber then left a voice mail for Lukather that "repurchase requests are not overnight, that this may take some time." She also said that she would "nudge" Wasco on that. On April 3, 2007, Wasco telephoned Weber and told her that he was "waiting on salesman at dealership, turned over to have [Lukather] go in and discuss what vehicle he would like." Weber then immediately telephoned Lukather and told him that Wasco had contacted the dealer, who was to contact Lukather about a "trade into a new vehicle." Lukather told Weber that he wanted all of his lease money back, and after he got that, he would buy another Cadillac. Weber responded that there were "usage fees, time and mileage that need to be applied," and that he would not be reimbursed all of his lease payments. Lukather stated that he would be contacting his attorney and sought no further assistance.

On April 5, 2007, Lukather called Weber and left a voice mail asking what GM would pay him back from what he had paid on his lease. Wasco also left a voice mail for Weber on April 5, stating that Lukather wanted all of his money back, "that may not happen, but will research an exchange of collateral on the lease, where all payments will apply to new lease, that is what he is shooting for . . . ." According to Weber, Wasco stated that Lukather "needs to get into his vehicle and out of the rental vehicle, verified that vehicle is repaired. GM will not be paying for the rental vehicle at this point." After receiving Wasco's voice mail, Weber called Lukather, who told her that Wasco wanted him to work with the dealership to choose another vehicle, but Lukather did not want another car; he wanted all of his money back. Weber again told Lukather that there would be "time and mileage charges." Weber also told Lukather that Wasco was working on an exchange of collateral on the lease. Lukather again stated that he did not want another vehicle. Lukather told Weber that the rental car agency asked him for a deposit payment if he was going to continue with the rental; Weber told Lukather that the Cadillac was repaired and "our recommendation is that [Lukather] return the rental, drive his vehicle while we iron out the details, this is not an overnight process." Lukather responded that someone should be able to give him an answer that day; Weber told him that "if he wants an

answer today we would not be able to give him that." Lukather said that "someone can," and hung up on Weber.

Later on April 5, Weber left a message for Wasco that Lukather "is adamant that he wants a straight repurchase, refuses to pick up [the Cadillac], as that will be a sign that he accepts it as repaired, and will not return rental."

Lukather testified at trial that on April 4 or 5, 2007, Weber told him that it would take *several months* for GM to decide whether to buy back the Cadillac. At trial, Lukather did not recall whether he ever spoke with Wasco.

According to Wasco's trial testimony, he telephoned Lukather sometime between April 2 and 4, 2007, and got the impression that Lukather was still exploring whether he wanted a straight repurchase or a trade repurchase. At that time, Wasco believed that the Cadillac was repaired. Wasco claimed at trial that he explained to Lukather the specifics regarding his options of a straight repurchase or a trade repurchase and that he was not trying to force Lukather into accepting a replacement vehicle. There was no written documentation of Wasco's telephone conversation with Lukather.

In his deposition, Wasco testified that he did not contact Lukather directly to tell him that GM would repurchase the Cadillac, he did not know if anyone from GM told Lukather that GM would repurchase the Cadillac, and he believed that Weber was attempting to call Lukather to tell him that GM would repurchase the Cadillac when Lukather refused to return GM's calls.

Wasco left a voice mail message for Weber on April 10, 2007, asking for the name and address of the lienholder and the vehicle identification number for the Cadillac. Wasco stated that once he had the foregoing information, he would turn it over to the proper people, who would take a couple of weeks to "pull [Lukather] out of the [Cadillac]." Wasco also noted that the group "that does this will figure out the payments, usage fee will be small as [Lukather] complained of situations early on in the life of the [Cadillac]." Wasco stated that GM would not pay for Lukather's rental car.

On April 10, Weber spoke with Lukather, who told her that GMAC was the lienholder. Weber told Lukather that he should pick up the Cadillac, as GM was no longer paying for his car rental. Lukather reiterated that he would not drive the Cadillac. Weber provided Wasco with the information he had requested on April 10, 2007.

On April 12, 2007, Lukather, through his attorney, filed a complaint against GM and the dealer under the Act. On April 26, Weber, who was unaware of

the lawsuit, called Lukather. Lukather told Weber that he had retained an attorney and that Weber should talk to his attorney.

GM sent letters to Lukather's attorney on May 9 and 23, 2007, seeking information about the Cadillac and requesting that Lukather return a signed release of lien information to GM. The May 23 letter stated that "an offer cannot be made until the necessary, previously requested documents have been provided." Although neither Lukather nor his attorney responded to GM's letters or provided any documents, GM made a repurchase offer to Lukather by letter of May 25, 2007. The letter offered to pay off the lienholder (GMAC) with a specific sum of money and to pay Lukather and his attorney $22,084.94. The latter amount included $19,584.94 for Lukather's lease payments, minus $380.31 for the "Usage/Depreciation (854 miles)," plus $2,500 in attorney fees. The letter also contained a "Release of Claim" for Lukather's signature. Lukather's attorney did not respond to the May 25 letter.

At the conclusion of the trial in March 2008, the trial court made a tentative ruling that GM violated the Act. In its statement of decision issued in May 2008, the trial court found that Lukather's trial testimony was credible and that Wasco's trial testimony was not credible. The court determined that GM did not act promptly in offering to repurchase the Cadillac, stating, "The [service request activity log] does not support GM's claim it did so." The trial court also determined that GM's violation of the Act was willful, permitting the assessment of a civil penalty, reasoning that the Cadillac "was delivered to the dealer on 2/12/07. This action was filed 4/12/07. Between those 2 dates the Court finds GM was not acting in good faith in providing plaintiff with a clear and prompt spelling out of his rights under the statute and in trying to persuade him to accept a replacement rather than the repurchase he initially and periodically requested." The court also determined that Lukather was not required to mitigate his damages after GM made a clear offer to refund his money.

In early August 2008, GM repurchased the Cadillac and refunded all of the money Lukather had paid on the Cadillac lease. On September 26, 2008, an amended judgment (judgment) was entered in favor of Lukather and against GM. Lukather was awarded actual damages of $61,398.13, prejudgment interest of $4,754.62, civil penalties of $61,398.13, and attorney fees, costs and expenses of $57,755.69, for a total of $185,306.57.

## DISCUSSION

### A. *Sufficiency of the Evidence*

GM claims the evidence was insufficient to support the finding that it violated section 1793.2(d)(2), maintaining that the trial court erred in imposing the duty on it to make restitution to Lukather on the "very same day it determined the Cadillac was a lemon or in the very first call offering Mr. Lukather his options." GM argues that the obligation to provide Lukather a replacement car or restitution is a "process" that "requires a series of labor intensive steps to be undertaken" and the process cannot be accomplished in a single telephone call or a single day. GM contends that in placing the duty on GM "to provide [Lukather] the financial specifics of the offer[,] the trial court held GM to a standard of conduct not required by Section 1793.2(d)(2), and one that was impossible for GM to meet on March 23, 2007." We disagree.

GM's arguments are based on mischaracterizations of the trial court's findings and determinations. The trial court did not place on GM the duty to make restitution to Lukather on the *first day* it determined the Cadillac was a lemon. Rather, the trial court found that on March 8, 2007, Lukather communicated his desire for a "vehicle repurchase" to GM and for weeks thereafter GM did not try to comply with his request, but instead tried "to persuade him to accept a *replacement* rather than the *repurchase* he initially and periodically requested." (Italics added.) Thus, the trial court found that GM stalled and frustrated Lukather's attempts to obtain restitution for many weeks.

And the evidence supports the implied finding that GM had ample time in the period between March 8 and April 12, 2007, in order to comply with the Act. No evidence supports GM's assertion that in this case the matter of restitution was a labor-intensive process that required months to accomplish. In its May 23, 2007 letter, GM offered Lukather restitution and asked Lukather for further information which GM claimed was required in order to calculate the amount of such offer. Even without any response from Lukather to GM's May 23, 2007 letter, it took GM two days—until May 25, 2007—to obtain the appropriate information on its own, to calculate an amount of restitution, and to send Lukather a letter with its offer. Accordingly, once GM decided to make an offer of restitution, it took GM two days to determine the amount it needed to do so. The record thus belies GM's assertion that the process of restitution is labor intensive and requires months to accomplish.

To the extent that GM contends that Lukather's conduct and statements indicated that he was indecisive about which option he wanted, and

that Lukather had a duty to make a selection *before* GM had a duty to act promptly, a similar contention has been rejected. In *Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294 [45 Cal.Rptr.2d 10] (*Krotin*), the court addressed the issue of whether, under the Act, a lessee who justifiably rejects or revokes acceptance of a car must do so within a reasonable time after discovering the grounds for rejection or revocation. Amici curiae argued that "if a manufacturer, pursuant to the Act, must respond promptly to a consumer's demand for replacement or reimbursement, then the consumer must be under a duty to notify the manufacturer in a reasonable and timely manner of the need for such action. Otherwise, the argument goes, the manufacturer would have to become 'clairvoyant' with respect to acknowledging and responding to otherwise unknown claims by consumers. However, as previously discussed, the Act does not *require* consumers to take any affirmative steps to secure relief for the failure of a manufacturer to service or repair a vehicle to conform to applicable warranties—other than, of course, permitting the manufacturer a reasonable opportunity to repair the vehicle. . . . In reality, as indicated by the facts alleged at trial by the Krotins, the manufacturer seldom on its own initiative offers the consumer the options available under the Act: a replacement vehicle or restitution. Therefore, as a practical matter, the consumer will likely request replacement or restitution. But the consumer's request is not mandated by any provision of the Act. Rather, the consumer's request for replacement or restitution is often prompted by the manufacturer's unforthright approach and stonewalling of fundamental warranty problems." (*Krotin, supra,* 38 Cal.App.4th at pp. 302–303.)

The *Krotin* court concluded that as the Act "stands now, however, the manufacturer has an affirmative duty to replace a vehicle or make restitution to the buyer if the manufacturer is unable to repair the new vehicle after a reasonable number of repair attempts, and the buyer need not reject or revoke acceptance of the vehicle at any time. The buyer need only provide the manufacturer with a reasonable opportunity to fix the vehicle. Accordingly, the jury instruction [the lessee] complained of which required the lessee in the present case to reject or revoke acceptance within a reasonable time was error." (*Krotin, supra,* 38 Cal.App.4th at p. 303.)

GM cites no authority to support the proposition that Lukather himself had a duty to act promptly under the Act. Even if such a duty were to be imposed on Lukather, the evidence shows that on March 8, 2007, Lukather did unequivocally request a "vehicle repurchase" rather than a replacement under the Act. Such a request was sufficient to inform GM of which option Lukather had selected and to trigger GM's duty to promptly make restitution.

GM's reliance on *Marquez v. Mercedes-Benz USA, LLC* (Ct.App. 2008) 312 Wis.2d 210 [751 N.W.2d 859] is misplaced. In *Marquez,* the Wisconsin Court

of Appeals reversed a summary judgment in favor of a consumer under Wisconsin's lemon law, holding that triable issues of fact existed as to whether the consumer intentionally withheld loan payoff information from the manufacturer and intentionally caused it to miss the law's 30-day refund window. (*Marquez, supra,* 751 N.W.2d at pp. 863–866.) *Marquez* is inapposite because there is no evidence here that Lukather ever withheld from GM any information it needed to make an offer to repurchase the Cadillac. GM thus fails to establish any error or insufficiency of the evidence with respect to the finding that it violated section 1793.2(d)(2).

GM claims the evidence was insufficient to support the trial court's finding that GM's violation of the Act was willful. Not so. Civil Code section 1794 provides in pertinent part: "(a) Any buyer of consumer goods who is damaged by a failure to comply with any obligation under this chapter . . . may bring an action for the recovery of damages and other legal and equitable relief. [¶] . . . [¶] (c) If the buyer establishes that the failure to comply [with the Act] was willful, the judgment may include, in addition to the amounts recovered under subdivision (a), a civil penalty which shall not exceed two times the amount of actual damages. . . ."

The court in *Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174 [28 Cal.Rptr.2d 371] defined the term "willful" in Civil Code section 1794, subdivision (c), as follows: "[A] violation [of the Act] is not willful if the defendant's failure to replace or refund was the result of a good faith and reasonable belief the facts imposing the statutory obligation were not present. This might be the case, for example, if the manufacturer reasonably believed the product *did* conform to the warranty, or a reasonable number of repair attempts had not been made, or the buyer desired further repair rather than replacement or refund. [¶] Our interpretation of section 1794(c) is consistent with the general policy against imposing forfeitures or penalties against parties for their good faith, reasonable actions. Unlike a standard requiring the plaintiff to prove the defendant *actually knew* of its obligation to refund or replace, which would allow manufacturers to escape the penalty by deliberately remaining ignorant of the facts, the interpretation we espouse will not vitiate the intended deterrent effect of the penalty. And unlike a simple equation of willfulness with volition, which would render 'willful' virtually all cases of refusal to replace or refund, our interpretation preserves the Act's distinction between willful and nonwillful violations." (*Kwan, supra,* 23 Cal.App.4th at p. 185.) Accordingly, "[a] decision made without the use of reasonably available information germane to that decision is not a reasonable, good faith decision." (*Id.* at p. 186.)

Here there was sufficient evidence to support the trial court's willfulness finding. Lukather's testimony and GM's telephone logs permitted the

trial court to make the following reasonable inferences: GM knew or reasonably should have known from information available from the dealer on March 8, 2007, that the Cadillac was a "lemon" and Lukather had selected the restitution option. Nevertheless, for the next two months GM did not act in good faith to provide Lukather with the restitution remedy; rather, GM actively discouraged Lukather from pursuing this remedy by telling him that the Cadillac was repaired and he should pick it up, that he should select another car at the dealer, that he would not get all of his money back, and that it would take several months for GM to act on his request for restitution. GM fails to persuade us that the evidence is insufficient to support the finding that its violation was willful so as to trigger the imposition of a civil penalty.

### B. *Mitigation of Damages Defense*

GM contends that the trial court erred in rejecting its mitigation of damages defense. Again, we disagree. GM maintains that it was Lukather's refusal to respond to GM that caused him to incur rental car expenses of approximately $21,000 unnecessarily. GM asserts that after it stopped paying for Lukather's rental car expenses on April 4, 2007, Lukather had an obligation either to buy another car or to accede to GM's May 25, 2007 refund offer (which was less than the damages to which he was entitled). But GM fails to cite any legal authority showing that the Act affords such a defense under the circumstances of this case.

What GM essentially seeks is an offset for Lukather's use of a rental car. A similar claim was rejected in *Jiagbogu v. Mercedes-Benz USA* (2004) 118 Cal.App.4th 1235 [13 Cal.Rptr.3d 679] (*Jiagbogu*), where the manufacturer sought an equitable offset against the buyer's damages because the buyer continued to use his car after he made a buy-back request.

██ "Section 1793.2, subdivision (d)(2)(C), and (d)(2)(A) and (B) to which it refers, comprehensively addresses replacement and restitution; specified predelivery offset; sales and use taxes; license, registration, or other fees; repair, towing, and rental costs; and other incidental damages. None contains any language authorizing an offset in any situation other than the one specified. This omission of other offsets from a set of provisions that thoroughly cover other relevant costs indicates legislative intent to exclude such offsets." (*Jiagbogu, supra*, 118 Cal.App.4th at pp. 1243–1244.) "Interpretations that would significantly vitiate a manufacturer's incentive to comply with the Act should be avoided. [Citation.] . . . An offset for the buyer's use of a car when a manufacturer, already obligated to replace or refund, refuses to do so, would create a disincentive to prompt replacement or restitution by forcing the buyer to bear all or part of the cost of the manufacturer's delay. Exclusion of such offsets furthers the Act's purpose.

[¶] . . . [T]o give [the manufacturer] an offset for that use would reward it for its delay in replacing the car or refunding Jiagbogu's money when it had complete control over the length of that delay, and an affirmative statutory duty to replace or refund promptly. 'No one can take advantage of his own wrong.' (§ 3517.) Nor can principles of equity be used to avoid a statutory mandate. [Citation.]" (*Jiagbogu, supra*, 118 Cal.App.4th at p. 1244.)

As in *Jiagbogu*, the imposition of a requirement that Lukather mitigate his damages so as to avoid rental car expenses—after GM had a duty to respond promptly to Lukather's demand for restitution—would reward GM for its delay in refunding Lukather's money. It is undisputed that GM did not refund Lukather's money until August 2008, after the trial had concluded and during the period of posttrial motions. We thus conclude that GM provides neither legal authority nor any equitable ground to support its mitigation of damages defense.

## C.   *Prejudgment Interest; Attorney Fees and Costs; Sanctions*

We reject GM's contention that the trial court abused its discretion in awarding prejudgment interest beginning on March 22, 2007. GM asserts that prejudgment interest is inappropriate during any time that the creditor (Lukather) prevents the debtor (GM) from paying the debt, and that "Lukather would not permit GM to pay that debt from April 5, 2007 onward." But the trial court reasonably could have concluded that the evidence did not establish that Lukather prevented GM from paying the debt, notwithstanding the pendency of the lawsuit. Indeed, it was during the pendency of the case in August 2008 that GM eventually reimbursed Lukather for his lease payments. GM fails to show that the trial court abused its discretion in awarding prejudgment interest.

GM's final contention deals with the award of attorney fees and costs, which it claims should be reversed and revisited if we reverse the trial court's awards of civil penalties and prejudgment interest. As we do not reverse those awards, there is no basis to reverse the award of attorney fees and costs.

Lukather seeks sanctions against GM on the grounds that GM's opening brief ignores evidence favorable to the judgment and that the appeal is frivolous. We decline to award sanctions under the standards set out in *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179].

## DISPOSITION

The judgment is affirmed. Respondent Paul Lukather is entitled to costs on appeal.

Chaney, J., and Johnson, J., concurred.